VILLAGE OF BLAINE AND ANOTHER v.
INDEPENDENT SCHOOL DISTRICT NO. 12 AND OTHERS.

138 N. W. (2d) 32.

September 24, 1965—No. 39,688.

344

Peter S. Popovich, James E. Knutson, and Peterson & Popovich, for appellant school district.

Charles B. Howard and Howard, Peterson, LeFevere, Lefler & Hamilton, for appellant commission.

Fred Burstein, for appellant village of Circle Pines.

Thomas G. Forsberg, for respondent village of Blaine.

Joseph A. Maun, Jerome B. Simon, and Maun, Hazel, Green, Hayes, Simon & Aretz, for respondent North Central Public Service Company.

NELSON, JUSTICE.

Defendants appeal from an order of the district court granting a permanent injunction. The case was previously before this court upon appeal by plaintiffs from an order denying their motion for a temporary injunction. Village of Blaine v. Independent School Dist. No. 12, 265 Minn. 9, 121 N. W. (2d) 183. The facts were partially stated in the prior opinion.

Plaintiff village of Blaine and defendant village of Circle Pines are duly organized municipal corporations, both situated in Anoka County. Plaintiff North Central Public Service Company is an Iowa corporation duly qualified to carry on its business in the State of Minnesota, and defendant Independent School District No. 12 is a duly organized independent school district created and operating pursuant to applicable Minne-

sota statutes. The village of Circle Pines operates water, gas, and electric utilities, the village council having by ordinance expressly accepted the provisions of Minn. St. 412.331 to 412.391 and having established a public utilities commission which was thus conferred with jurisdiction over the utilities system of that village.

At the time of the commencement of this action the members of the Circle Pines Public Utilities Commission were defendants Gerald Pehl and Andrew Gibas, who are now serving on the commission with John Juleen, a later appointee. The village of Blaine adopted Blaine Village Franchise Ordinance No. 48 on July 3, 1959, which ordinance is still in force. Pursuant to this ordinance North Central Public Service Company established and is now maintaining and operating a gas distribution system in Blaine. As a part of its distribution system under this franchise North Central constructed a 6-inch gas main running in an east-west direction on the north side of County Road No. 10, also known as 101 First Avenue and as the North Road. The Circle Pines Utilities Commission also has established and is presently maintaining and operating a gas distribution system in that village. As a part of this gas distribution system, a gas main running in an east-west direction on the south side of County Road No. 10 was constructed by the commission.

Independent School District No. 12 is the owner of a site known as the Centennial campus which is located wholly within the village of Blaine adjacent to County Road No. 10. Centennial Senior High School and Centennial Junior High School, which are operated by the district, are located on this site. The south boundary line of the village of Blaine and the north boundary line of the village of Circle Pines run along the middle of the paving on County Road No. 10, which is a county road and does not constitute a street, alley, roadway or public ground in either village.

On October 26, 1961, defendant school district published an invitation for bids on the installation of gas piping from Centennial High School, located within the boundaries of Blaine, across County Road No. 10 to a site within the village of Circle Pines.

Following the advertisement plaintiffs commenced this action seeking a permanent injunction to enjoin defendant school district from con-

tracting for the construction of this gas line and, in addition, to enjoin the Circle Pines Utilities Commission and the village of Circle Pines from extending the Circle Pines gas distribution system into the village of Blaine and from providing natural gas service to the Centennial High School building and other buildings of the school district located in Blaine. Plaintiffs obtained a temporary restraining order and later moved the court for a temporary injunction pending the final outcome of the trial of the case. The temporary injunction was denied December 13, 1961. After plaintiffs appealed to this court, a decision was rendered February 21, 1963, remanding the case for trial.

On December 27, 1961, defendants entered into an agreement for gas service wherein the Circle Pines Utilities Commission agreed to supply gas to the school district for its Centennial Junior and Senior High Schools. That contract provided that the commission would arrange for a conveyance to the school district of a small plot of land in the village of Circle Pines, to be used as the site of the connection of the Circle Pines natural gas system to the school district's gas pipe. After the court below had denied the temporary injunction, and prior to the decision of this court on the first appeal, the school district awarded a contract for the construction of the gas transmission main from Centennial Senior High School in Blaine across but underneath County Road No. 10 to the connection site in the village of Circle Pines. The construction of the gas main was completed in 1962 and from that time the Circle Pines Utilities Commission has furnished natural gas to the school district at the connection site for consumption in its school buildings. There has been located a metering station on the connection site in the village of Circle Pines with necessary valves, regulators, meters, and relief valves for the control of the flow of gas. This site serves no purpose for the school district other than to be the place for the gas connection with the Circle Pines utilities system, and there is no appliance or apparatus on the site which uses or consumes natural gas. All of the natural gas delivered at the site is consumed wholly within the village of Blaine although the Circle Pines Utilities Commission has not obtained a franchise or the consent of the village of Blaine to sell gas within its confines.

As early as August 18, 1961, Ray Ernst, Circle Pines village manager,

and utilities commissioner Thomas Brown requested the Blaine village council to grant a franchise to the village of Circle Pines to supply natural gas to users in Blaine. The village of Blaine refused this request and has never consented to any extension by the Circle Pines Utilities Commission of its gas service to consumers located wholly within the village of Blaine. It is clear that the franchise granted to North Central by the village includes the right not only to lay pipes and install equipment but also to operate a public utility providing natural gas service to the village and to do all things necessary to conduct the utility business, subject to the regulations of the village. The village, by granting this franchise, elected to have North Central provide a gas utilities system within the village for the benefit of the village and its citizens rather than to establish a municipal utilities commission as was done in Circle Pines. Plaintiffs contend that the activities of defendants in furnishing natural gas to the school district for use in buildings located wholly within the village of Blaine has caused irreparable injury and damage to the right of the village to franchise and regulate the gas utility service within its boundaries and to North Central, which has the only franchise granted by the village to provide such service to its citizens.

■ Certain statutory provisions are pertinent to a determination of the questions involved on this appeal. Minn. St. 412.321, subd. 1, provides:

"Any village may own and operate any waterworks or gas, light, power, or heat plant for supplying its own needs for utility service or for supplying utility service to private consumers or both. It may construct and install all facilities reasonably needed for that purpose and may lease or purchase any existing utility properties so needed. It may, in lieu of providing for the local production of gas, electricity, water, or heat, purchase the same wholesale and re-sell it to local consumers. After any such utility has been acquired, the council, except as its powers have been limited through establishment of a public utilities commission in the village, shall make all necessary rules and regulations for the protection, maintenance, operation, extension, and improvement thereof and for the sale of its utility products."

Minn. St. 412.321, subd. 3, provides in part:

"Any village may, except as otherwise restricted by this section, extend any such public utility outside its limits and furnish service to consumers in such area at such rates and upon such terms as the council or utility commission, if there is one, shall determine; *but no such extension shall be made into any incorporated municipality without its consent.*" (Italics supplied.)

Minn. St. 300.04 provides in part:

"Corporations may be organized for the construction, acquisition, maintenance, or operation of any work of internal improvement, including * * * any work for supplying the public * * * with water, light, heat, or power, including all requisite * * * pipes, and other conduits * * *. No corporation so formed shall construct, maintain, or operate * * * any * * * pipe line, or other conduit, * * * in or upon any street, alley, or other public ground of a city or village, *without first obtaining from the city or village a franchise conferring such right and compensating the city or village therefor.*" (Italics supplied.)

Minn. St. 300.04 provides in part:

"The state shall at all times have the right to supervise and regulate the business methods and management of any such corporation and from time to time to fix the compensation which it may charge or receive for its services. *Every such corporation obtaining a franchise from a city or village shall be subject to such conditions and restrictions as from time to time may be imposed upon it by such municipality.*" (Italics supplied.)

It must be clear from a reading of Minn. St. 412.321 that each municipality may elect whether it will provide its own utility system or grant franchises to private utilities to provide the needed service. Should a municipality elect to maintain its own utilities, it may vest control of their functions and services in a public utilities commission pursuant to § 412.331 or may allow the council of the municipality to retain control. It is equally clear that if a private utility is accorded a franchise to provide the service, it is subject to the control provided by § 300.04.

■ According to 8A Dunnell, Dig. (3 ed.) § 3807—

"A franchise is a special privilege conferred by the government upon an individual or corporation, which does not belong to citizens generally

of common right; a privilege or immunity of a public nature, which cannot be legally exercised without legislative grant; a privilege conferred by grant from government and vested in individuals. *To constitute a franchise, the right possessed must be such as cannot be exercised without the express permission of the sovereign power."* (Italics supplied.)

It is well established in this state that a franchise as contemplated by our statutes constitutes a property right, an incorporeal hereditament. This court in one of its early opinions, McRoberts v. Washburne, 10 Minn. 8 (23), said that an estate in a franchise and an estate in land rest upon the same principle.

After a careful consideration of the briefs filed by defendants, it seems advisable to point out the distinction between what may be a municipal corporation in the more technical sense and a municipal corporation which constitutes a municipality. In Danculovic v. Zimmerman, 184 Minn. 370, 238 N. W. 695, this court indicated an interest in the meaning of the words "municipal," "municipality," and "municipal corporation." It was there said (184 Minn. 371, 238 N. W. 695):

"An 'incorporated place' is either a city, village, or borough. A town is not such a place; neither is a county; each is an area as distinguished from a place. 'Council' means the governing body of a municipality. That term is applicable only to an incorporated city, village, or borough; there is no such thing as a 'council' of a county or of a town. The former is governed by a board of county commissioners, and the latter by a town board.

"In § 256 a distinction is made between a municipality and a municipal corporation. The latter is the broader term. Cities, villages, boroughs, counties, and towns are municipal corporations, as is also a school district; but only the first three named are municipalities.

"It is to be noted that municipalities as above defined are 'incorporated'; but counties, towns, and school districts are 'organized.' However, each of them is a body corporate—a municipal corporation."

See, 13A Dunnell, Dig. (3 ed.) §§ 6516 and 6517.

While school districts are not technically municipal corporations, they are at least public corporations. But they are not within Minn. Const.

art. 1, nor are they within U. S. Const. Amend. XIV, § 1.[1] They are quasi-public corporations, governmental agencies with limited powers. They are arms of the state and are given corporate powers solely for the exercise of public functions for educational purposes. See, Mokovich v. Independent School Dist. No. 22, 177 Minn. 446, 225 N. W. 292, and other cases cited in 17 Dunnell, Dig. (3 ed.) § 8662.

We think it clear from a reading of the above statutes that the type of utilities here involved may not operate in cities and villages without franchises from those cities and villages. See, Minnesota Canal & Power Co. v. Pratt, 101 Minn. 197, 112 N. W. 395, 11 L. R. A. (N.S.) 105; State ex rel. Mason v. Consumers Power Co. 119 Minn. 225, 137 N. W. 1104, 41 L. R. A. (N.S.) 1181. In the Canal & Power Co. case the question was whether the plaintiff corporation had the right of eminent domain. Its business, as stated in its article of incorporation, was to generate electricity and supply current to the public for light, heat, and power purposes. Objection was made that the company had received no municipal franchises. This court said (101 Minn. 215, 112 N. W. 398):

"* * * It may never be called upon to serve a city or village. If it does, it must obtain a franchise and submit itself to such further conditions and restrictions as from time to time may be imposed upon it by such municipality."

In the Mason case, this court, speaking of an electric company, said (119 Minn. 236, 137 N. W. 1109):

"* * * Before this franchise ordinance was enacted the respondent's

---

[1] Minn. Const. art. 1, § 2, reads: "No member of this State shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers. There shall be neither slavery nor involuntary servitude in the State otherwise than the punishment of crime, whereof the party shall have been duly convicted."

The pertinent part of U. S. Const. Amend. XIV, § 1, provides: "* * * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

predecessor, and so the respondent, had no right whatever to maintain its system in the city of St. Paul."

Clearly then, the utilities specified in the foregoing statutes must have municipal franchises if they are to do business in cities and villages within this state.[2] The grant of a right to maintain public utilities within the municipality and to exact compensation therefor is a franchise. Village of Blaine v. Independent School Dist. No. 12, 265 Minn. 9, 121 N. W. (2d) 183.

The power to grant a franchise is a high legislative trust, delegated to municipalities in this state. Kuehn v. Village of Mahtomedi, 207 Minn. 518, 292 N. W. 187. See, Grand Trunk Western Ry. Co. v. City of South Bend, 227 U. S. 544, 553, 33 S. Ct. 303, 306, 57 L. ed. 633, 639; White v. City of Meadville, 177 Pa. 643, 35 A. 695, 34 L. R. A. 567. A municipality in this state thus has the authority to grant franchises to those it deems best qualified and who willingly subject themselves to the control vested in the municipality. If a municipality refuses to consent to an application from a private or municipal utility to provide service within the boundaries of the municipality, it has the statutory authority to prevent the utility from providing such service in competition with franchised utilities. The explicit statutory provisions previously quoted apply both to cities and villages and cannot be evaded by methods contrived to accomplish what the municipality has refused to permit. The Ontario appellate court in Township of Barton v. City of Hamilton, 18 Ont. 199, 202, gave a persuasive reason for our position. That court said:

"The cardinal principle of municipal government is, that each municipality should be as far as possible self-governing in matters of police and municipal jurisdiction, and that one municipality should not invade the territory or interfere with the concerns of another municipality without the consent of the latter, or the adjustment of points of difference by the means of arbitration or other appropriate tribunal."

No one disputes that the police power, to whatever extent it has been vested by the legislature in municipalities such as cities and villages, has

---

[2] See, Hanft, *Control of Public Utilities in Minnesota*, 16 Minn. L. Rev. 457.

application to the furnishing of water, heat, light, power, gas, and other essential public services. Utilities furnishing such services must be subject to reasonable regulations in order to properly protect the consumer and the public. Our statutes prohibit unfranchised utilities from operating competitively in any city or village in this state and thereby foreclosing governmental control of these essential services.

Defendants have now, as they did on the prior appeal, cited an opinion of the attorney general, No. 476b-1, issued March 30, 1960. While the attorney general's opinions are entitled to careful consideration at all times, they are not binding upon the courts. Village of Blaine v. Independent School Dist. No. 12, *supra*. The following question was directed to the attorney general:

"If the School District wishes *to purchase gas* from the Circle Pines Municipal System, must permission be obtained from the Village of Blaine, or is the School District a 'municipality' within the meaning of M. S. A. Section 412.321, subdivision 3?" (Italics supplied.)

The answer given by the attorney general was as follows:

"M. S. § 412.321, subd. 3, authorizes the village of Circle Pines to extend its municipal gas system outside its limits and to furnish services to the buildings of the school district in the adjoining area at such rates and upon such terms as may be agreed upon. However, it is expressly provided under said subd. 3 that 'no such extension shall be made into any incorporated municipality without its consent.'

"The village of Blaine, being an 'incorporated municipality' within the meaning of subd. 3, it follows that the village of Circle Pines must obtain the consent of the village of Blaine in order to extend its gas system into any area within the boundaries of the village of Blaine.

"A school district is not an 'incorporated municipality' within the meaning of § 412.321, subd. 3. A school district is 'organized'; it is not 'incorporated'. See 13 Dunnell's Digest, 3d Ed., § 6516."

As we read the attorney general's opinion, it clearly concludes that the purchase of gas by the school district from the Circle Pines commission for use in Blaine is an extension of the Circle Pines public utility system into Blaine. The opinion plainly holds that such extension requires the

consent of the village of Blaine. The opinion is therefore in accord with plaintiffs' position and, to the extent quoted above, constitutes a proper interpretation of Minn. St. 412.321, subd. 3.

Another question submitted to the attorney general was:

"May the Village of Circle Pines furnish gas to the School District on the Circle Pines side of the highway if the School District takes delivery on the Circle Pines side and pipes the gas to its building on its own?"

The answer was as follows:

"Yes. Sec. 412.321 grants such authority. It should be noted, however, that the board of county commissioners has jurisdiction over and supervision of the county highways. Cf. L. 1959 c. 500, Art. IV, § 2 [163.02]. It may be necessary for the village of Circle Pines or the school district to obtain the consent of such board to extend its gas line across or along the county highway."

It must be apparent that the attorney general did not consider this question as raising again the question of the necessity of consent on the part of the village of Blaine. That subject is covered completely by the answer to the first question quoted above and in answering the next question the attorney general undoubtedly assumed that the consent of the village, as required by his first answer, had been obtained. No doubt, this assumption was also the reason for his reference to § 412.321 in the answer to the second question. He clearly was of the opinion that the consent of the village was required.

■ Defendants in their brief appear to place some reliance on a supposed conflict of power between an incorporated municipality and an organized school district. The issue in the present case is whether the Circle Pines Utility Commission has violated § 412.321, subd. 3, and the other applicable statutes. Nothing in the record submitted presents a basis for finding any conflict between the powers granted to a municipality in carrying out necessary municipal functions, or in exercising governmental police powers conferred on it by the legislature and the powers granted a school district.

Defendants have cited and appear to rely on Board of Education v. Houghton, 181 Minn. 576, 233 N. W. 834. The holding in that case

lends no support whatever to the apparent contentions of defendants that school districts are not subject to the police power of a village and that the governing authorities in the village of Blaine cannot thwart by injunction an attempt by the school district to obtain gas distribution through the connection of its gas line with the Circle Pines system. We agree with defendants that school districts are organized governmental agencies empowered by the legislature to perform the duties of educating the children of this state, that the subject of public education is beyond the control of municipalities, and that in performing the duties imposed on them by the legislature independent school districts are not subservient to municipalities.[3] School districts, however, have had no governmental police powers granted them by the legislature.

This does not mean that the municipalities in which school buildings may be located do not have certain police powers over all public grounds —including school grounds. Much the same theory as that advanced by appellants was advanced in Kansas City v. Fee, 174 Mo. App. 501, 160 S. W. 537. In that case appellant, a high school janitor, was convicted of violating a city ordinance requiring that no person not a fireman or engineer licensed by the city shall be in charge of a steam boiler of certain specifications. It was asserted that the city had no power or authority to make regulations governing or binding upon public school employees. The court rejected that theory, stating (174 Mo. App. 504, 160 S. W. 538):

"Our laws vest in the public school authorities the 'supervision of instruction' but nowhere gives them governmental *police power.* [Citations omitted.] In other words, the school authorities are supreme in all matters directly, or by implication, involving the subject of education, but with the matter of governmental police regulations, having to do solely with the maintenance of public order and peace, the health, safety and freedom from violence of the citizens of the state and the protection of property from destruction by violence, the school authorities have nothing to do. And it is well for them that they do not.

---

[3] Minn. Const. art. 8, §§ 1 and 3; State ex rel. Bd. of Education v. Erickson, 190 Minn. 216, 251 N. W. 519; State ex rel. Klimek v. School Dist. No. 70, 204 Minn. 279, 283 N. W. 397; 17 Dunnell, Dig. (3 ed.) § 8662.

* * * * *

"Under defendant's view of the case the school district, merely because it is a quasi political entity of itself, is supreme in its control over its real estate and is not subject to any regulations of the city. It is not necessary to pass on the correctness of this position as to its control over its real estate, since the question is not involved. But if it is meant that on account of such control, the school board does not have to recognize any police regulations whatever, whether solely affecting the public generally or not, then the result of such theory would be to create little separate and independent kingdoms within the city where the sovereignty given to it by the state could not operate. In other words, there would be 'spots' in the city where its laws would have no force." [4]

We stated in Village of Blaine v. Independent School Dist. No. 12, 265 Minn. 9, 18, 121 N. W. (2d) 183, 191:

"The furnishing of heat, light, power, and gas also is properly within the scope of the police power and therefore subject to control and regulation by a municipality."

■ Here it is argued that the state provided school districts with special authority for heating of school buildings when it enacted Minn. St. 123.36, subds. 8 and 9, and 123.37, subd. 1. Section 123.36, subd. 8, reads:

"The board shall provide for the heating and care of schoolhouses and rooms and may provide for the heating and care of garages which house school buses."

Section 123.36, subd. 9, reads:

"The board may contract for the furnishing of heat for its building for such terms as it may deem for the best interest of the district, not exceeding ten years. Where it is necessary to lay mains or pipes to connect these buildings with a heating system, *the district is authorized to advance all, or any part of the cost thereof upon such terms and conditions as shall be agreed upon.*" (Italics supplied.)

---

[4] See, also, Kansas City v. School Dist. 356 Mo. 364, 201 S. W. (2d) 930, where the court made it clear that school districts are not given governmental police powers.

Section 123.37, subd. 1, dealing with the district's power to contract, need not be discussed. We agree that § 123.36, subds. 8 and 9, gives the school district authority to provide for heat and heating systems, but we do not agree that these provisions nullify the authority conferred by § 412.321, subd. 3, which permits a village to control the entry of a utility system into its confines. Such would be the effect if we held, as defendants suggest, that § 123.36, subds. 8 and 9, make the consent of a municipality to the entry of a foreign utility system unnecessary when products and services of such utility are furnished to school buildings located wholly within the borders of the municipality. We must reject this interpretation if possible since we are bound to construe the statutes so as to avoid conflict between them.

Both cases cited by defendants—Board of Education v. Houghton, *supra,* and Hall v. City of Taft, 47 Cal. (2d) 177, 302 P. (2d) 574—involved building ordinances, and the court held in effect in both that the legislature had preempted the field involved from local control so that it was immune from interference by certain municipal ordinances. These cases give no reason to adopt a construction of § 123.36, subds. 8 and 9, which would nullify the effect of § 412.321, subd. 3.

■ Defendants frame the final issue as follows:

"May a school district purchase natural gas for heating from a village utilities commission, where such gas is received on school district property within that village, in receptacle facilities constructed by the school district, and subsequently transported under and across a county road to buildings of the school district on an adjacent site thereto, within another village?"

They assert that this court failed to decide this basic issue, as they refer to it, on the earlier appeal. We remanded the case for trial on the merits by our former decision. After trial the district court concluded that the deals transacted between the defendants violated § 412.321, subd. 3. On the facts in the record, we also conclude that the foregoing section was clearly violated.

On that issue we refer to two cases, one determined in Iowa and the other in Tennessee. In Incorporated Town of Ackley v. Central States Elec. Co. 204 Iowa 1246, 214 N. W. 879, 54 A. L. R. 474, the plain-

tiff was a municipality under the laws of Iowa. Defendant Hadley operated a creamery plant within the corporate limits of the town and used electricity as motive power. He had been purchasing electrical energy from the municipal plant owned by plaintiff for some years, but found it unsatisfactory, expensive, and at times insufficient for his needs. Central States Electric Company, a codefendant, was a public utility furnishing electrical energy up to but not within the corporate limits of the plaintiff town. Marshall Canning Company, also a codefendant, had a plant in the town and through arrangements with Central built a line from the corporate limits of plaintiff town to Central's plant and purchased energy from Central. Defendant Hadley, becoming dissatisfied with the service he was receiving from plaintiff's municipal plant, contracted with Central to purchase electric power from it, agreeing to build his own line, and arranging with Marshall to connect his line with the line the canning company had within the city limits and thus procure electricity from Central through Marshall's line. No poles were to be set in the streets or alleys or in public ground belonging to the town in the construction of Hadley's line, although his wires would necessarily cross several streets in the town. While the line was under construction, differences arose between plaintiff and defendants and plaintiff brought an action for a temporary injunction, which was granted by the court. It was conceded that none of the defendants had a franchise authorizing construction of the line in the town. Defendant Central had, of course, no right whatever to enter the town and dispose of electrical energy therein because it had no franchise. The Iowa Supreme Court in affirming the lower court said (204 Iowa 1248, 214 N. W. 880):

"If the Central States Electric Company could contract to sell electricity to Hadley under these circumstances, there would be nothing to prevent every other user thereof within the city limits from making a similar contract with the electric company, and, therefore, Sections 5904 and 5905, Code of 1924, would be fully nullified, because the electric company would have the full advantage of furnishing its commodity to every resident of the town, notwithstanding the fact that it had no franchise whatever. If this process were allowed, then the electric company would have all the rights it would have under a franchise, without

having procured one by a vote of the people, as required by the aforesaid sections of the statute. Such a nullification of the statute will not be countenanced by an equity court.

"The question, therefore, narrows itself down to what, if any, rights the defendant Hadley had in this situation, and this question is still further narrowed by the fact that he has purchased and made arrangements for his own private right of way between his plant and the Marshall Canning Company's land. The question, therefore, is whether or not he has the right to stretch these wires across the streets and alleys of the plaintiff town."

The court also approved of the following rule (204 Iowa 1250, 214 N. W. 881):

"The public right to use of streets goes to the full width of the street, and extends indefinitely upward and downward. On the ground, therefore, of failure to exercise ordinary care to keep public ways in a reasonably safe condition for travel, municipal negligence may be established, on the theory of a defect in the street, in action for damages due to injuries to travelers from awnings, signs, billboards, poles, electric wires, or other objects suspended over, or near thereto, or falling into a street or sidewalk."

The Iowa court also cited and quoted with approval the following statement from Wheeler v. City of Fort Dodge, 131 Iowa 566, 570, 108 N. W. 1057, 1058, 9 L. R. A. (N. S.) 146, 149:

"* * * The fact that the wire in most of its course passed through the air above the heads of the people using the walks and carriageway below does not remove its character as an obstruction of the street. The public right goes to the full width of the street and extends indefinitely upward and downward so far at least as to prohibit encroachment upon said limits by any person by any means by which the enjoyment of said public right is or may be in any manner hindered or obstructed or made inconvenient or dangerous. The principle here stated has been upheld in a multitude of cases * * *."

One of the cases cited was Bohen v. City of Waseca, 32 Minn. 176, 19 N. W. 730, 50 Am. R. 564.

In the Tennessee case, Holston River Elec. Co. v. Hydro Elec. Corp.

17 Tenn. App. 122, 66 S. W. (2d) 217, it was claimed by the plaintiff, holder of a franchise to supply electricity in Rogersville, Tennessee, that defendant Hawkins County Creamery, which had a plant located in Rogersville, had entered into an agreement with defendant Hydro Electric Corporation to the effect that Hydro, from its transmission line without the corporate limits of Rogersville, would furnish electrical energy to the plant and property of the creamery within the town. This energy was to be transmitted over a line of wires built or furnished by the creamery from its plant in the town to a point outside of the city limits where the electrical energy was to be furnished by Hydro. The Tennessee court in holding plaintiff entitled to an injunction said (17 Tenn. App. 131, 66 S. W. [2d] 222):

"* * * It can be seen that a court of equity, by approving such a subterfuge, would be setting its seal of approval upon the contract between these two parties, and by so doing would avoid and set aside its former holding; we cannot agree with this proposition. We believe that the Hydro Electric Corporation is just as much doing business in the town of Rogersville by furnishing this electrical energy for the purpose of turning the wheels of the creamery located in the town as if it were itself transmitting the energy within the corporate limits of the town of Rogersville. It is the furnishing of the electrical energy to the creamery company for use in the town of Rogersville that constitutes doing business in the town of Rogersville within the meaning of the decree. To license and affirm an act of this kind for this party would mean that any corporation or individual could do likewise, and by so doing destroy the investment of the complainant, Holston River Electric Company, in the town of Rogersville, notwithstanding the fact that it had been lawfully permitted to make its investments there, and notwithstanding the fact that the Hydro Electric Corporation had been decreed to have no rights to operate in said town. Such a holding would deprive it of its rights and opportunities for earning on its investment. We think that this would certainly be taking private property without due process of law."

We think the Ackley and Holston cases are practically on all fours with the case before us and that they are, together with the Minnesota cases which we have cited, decisive of the issue herein.

It is undisputed that the franchise in the instant case was nonexclusive in character. The village itself could compete with North Central or could allow another gas utility to do so. But that fact does not imply that any other utility distributing gas may enter into competition in the village of Blaine at any time without the consent of the village, whether that consent be in the form of a license, easement, permit, or franchise. Since the village has refused to consent to such competition by the Circle Pines Utilities Commission, injunctive relief was properly ordered. See, Minn. St. c. 585.

The legislature has seen fit through § 412.321, subd. 3, to prohibit a village from extending its utilities system into another incorporated municipality without the latter's consent. It has made no exceptions to this rule. As will be seen from the cases cited, it is unimportant that the pipe through which the gas flows is owned by a school district and not Circle Pines, and that the sale and the furnishing of the commodity takes place in Circle Pines—for transporting across County Road No. 10 and into school buildings wholly located in the village of Blaine—since these facts do not change the fact that it is the Circle Pines Utilities Commission which is furnishing gas to consumers in Blaine without the consent of that village and, therefore, contrary to the statute. Plaintiffs are entitled to have the courts look at the effect of defendants' plan, which is simply that the Circle Pines Utilities Commission is furnishing natural gas via pipe system to consumers in the village of Blaine without obtaining a franchise and without the latter's consent. If the legislature deems it wise that only those utility companies who are so authorized by a franchise may serve consumers within a particular municipality, then the statutes so providing ought to be given the intended effect. Defendants' arrangement to circumvent them cannot stand.

We think that the actions of defendants clearly violate the purposes of §§ 412.321, subd. 3, 300.03, and 300.04, and that the trial court was correct in rejecting the various arguments advanced by them against the issuance of an injunction. The order of the district court should be and is affirmed.

Affirmed.

UPON APPEAL FROM CLERK'S TAXATION OF COSTS AND DISBURSEMENTS.

On November 5, 1965, the following opinion was filed:

PER CURIAM.

Defendants Independent School District No. 12, Anoka County, and the village of Circle Pines appeal from the clerk's allowance of plaintiff North Central Public Service Company's taxation of costs and disbursements. In Village of Blaine v. Independent School District No. 12, 265 Minn. 9, 25, 121 N.W. (2d) 183, 195, this court said:

"* * * In the interest of a just and equitable result we hereby order that the present costs and disbursements thus far accrued should await the final outcome of the forthcoming trial on the merits, and be recoverable by the party who ultimately succeeds."

The subject of costs and disbursements in this court was governed entirely by Minn. St. c. 607 during the pendency of this appeal. Section 607.01 thereof stated in part:

"In all cases the prevailing party shall be allowed his disbursements necessarily paid or incurred."

The foregoing portion of said statute was amended by L. 1965, c. 608, approved May 22, 1965, by adding thereto the words "unless otherwise ordered by the court." Prior to the foregoing amendment of § 607.01 this court could exercise no discretion in the allowance, disallowance, or apportionment of disbursements necessarily paid or incurred.

We held in Bingenheimer v. Diamond Iron Min. Co. 237 Minn. 332, 54 N. W. (2d) 912, that the state may be taxed as to costs and disbursements when acting in its proprietary capacity although it is immune while acting in its sovereign capacity. See, State v. McCoy, 228 Minn. 420, 38 N. W. (2d) 386; State v. Fullerton, 124 Minn. 151, 144 N. W. 755; and State v. Buckman, 95 Minn. 272, 104 N. W. 240, 289. This rule also applies to the state's political subdivisions when acting in a proprietary capacity.

Under the circumstances set forth in the record of the instant case the activities of both of the plaintiffs and of the defendant village of Circle Pines were obviously proprietary rather than sovereign. In regard to defendant Independent School District No. 12, it is our view under all the

circumstances that in buying and paying for fuel required to operate its schools, which is one of its statutory duties, it was acting as an agency of the state in its sovereign capacity. Under the circumstances it would enjoy immunity from taxation of costs and disbursements, but not so the village of Circle Pines, acting in a proprietary capacity in bargaining for the sale of its fuel. Fischer v. Town of Albin, 258 Minn. 154, 104 N. W. (2d) 32.

The clerk's taxation of costs and disbursements herein is sustained as against the village of Circle Pines.