SLIETER, Judge
The City of Brainerd and Brainerd Public Utilities Commission (BPUC) challenge the district court's determination that the City of Baxter may impose a revenue-raising franchise fee on a municipally-owned utility. Because Baxter does not have statutory authority to impose its franchise fee on BPUC, we reverse and remand.
FACTS
Baxter, a statutory city,[1] adopted an ordinance (ordinance 2016-023[2] ) that imposed a revenue-raising franchise fee solely on BPUC to fund Baxter's pavement management and street- and traffic-lighting *480 activities.[3] Baxter sought to enforce ordinance 2016-023 on Brainerd and BPUC by an action for: (1) a declaratory judgment pursuant to Minn. Stat. § 550.02 (2018), (2) an accounting, and (3) unjust enrichment. On cross-motions for summary judgment, the district court ruled that Baxter permissibly applied ordinance 2016-023 against BPUC in accordance with Baxter's statutory authority. The parties stipulated to entry of final judgment, and Brainerd and BPUC appealed. The issues before this court are purely legal questions, and the facts are undisputed.
In 1892, Brainerd established a utility to provide light and power. Via Brainerd's 1908 city charter, it operated the utility as the Brainerd Water and Light Department (BWLD) with a three-member board. In 1935, the BWLD extended its utility service into an area that incorporated as Baxter four years later.
On May 17, 1975, the Minnesota Public Service Commission, now known as the Minnesota Public Utilities Commission (MPUC), assigned BWLD to be one of the exclusive providers of retail electric services to customers in Crow Wing County.[4] This assignment order established an ongoing obligation that BWLD, and its successor BPUC, provide electricity in the northeastern portion of Baxter adjacent to Brainerd, both of which are in Crow Wing County.[5]
In 1985, Brainerd amended its city charter to establish BPUC and provided BPUC the responsibilities of the BWLD. Brainerd authorized BPUC to control, operate and manage its electrical service within the city. BPUC has the power to institute, prosecute and defend, in the name of Brainerd as it deems appropriate.
In 2013, Baxter commissioned a Pavement Management Plan study (PMP) about maintenance and funding of its city streets. The PMP determined Baxter needed to increase its maintenance budget for road infrastructure, and it identified utility-franchise fees as a possible funding source. Baxter requested that BPUC enter into a franchise agreement for BPUC's occupation and use of Baxter's right-of-way and BPUC's utility service to Baxter residents. BPUC never consented to a franchise agreement.
Baxter notified BPUC of its intention to adopt a franchise-fee ordinance pursuant to Minn. Stat. §§ 216B.02, and .36 (2018). Baxter identified its intent to use the franchise-fee funds for pavement management and street- and traffic-lighting activities.
After multiple city council meetings, Baxter adopted ordinance 2016-023, imposing its franchise fee on BPUC. The purpose section of ordinance 2016-023 provides:
*481 The Baxter City Council has determined that it is in the best interest of the City to impose a franchise fee on those public utility companies that provide electric energy services within the City of Baxter to fund pavement management related and street and traffic lighting related activities.
Baxter's ordinance 2016-023 identified Minn. Stat. § 301B.01 (2018), as its statutory authority to impose the franchise fee on BPUC. The franchise fee imposed on BPUC was determined by applying the following schedule per customer premise/per month for metered service within Baxter:
Class: Monthly Fee: Residential $3.00 Commercial $13.00 Demand $52.00 Large Power $138.00
Ordinance 2016-023 does not identify that Baxter is requiring a franchise from appellants. In a letter dated June 9, 2016, Baxter provided ordinance 2016-023 to BPUC noting the ordinance became effective 60 days after receipt. On August 8, 2016, ordinance 2016-023 became effective.
BPUC began to collect the franchise fee from their customers in accordance with ordinance 2016-023. BPUC made payment to Baxter, but Baxter determined the payments did not satisfy the amount owed.
On December 14, 2017, Baxter filed a complaint in Crow Wing County District Court against Brainerd and BPUC seeking enforcement of the franchise fee. Brainerd and BPUC argued Baxter lacks statutory authority to enforce ordinance 2016-023. Baxter cited Minn. Stat. §§ 216B.36, 222.37, subd. 1, 301B.01, and the district court denied Brainerd and BPUC's motion for summary judgment, and it granted Baxter's motion for partial summary judgment, declaring that Baxter may impose a franchise fee pursuant to Minn. Stat. §§ 216B.36, 301B.01, or 412.321, subd. 3.[6] The parties stipulated to entry of final judgment. This appeal follows.
ISSUE
Did the district court err by concluding that the franchise fee is authorized?
ANALYSIS
"We review the grant of summary judgment de novo to determine whether there are genuine issues of material fact and whether the district court erred in its application of the law." Montemayor v. Sebright Prods., Inc. , 898 N.W.2d 623, 628 (Minn. 2017) (quotation omitted); see also Hanbury v. Am. Family Mut. Ins. Co. , 865 N.W.2d 83, 85-86 (Minn. App. 2015) (recognizing summary judgment based on undisputed facts creates a legal conclusion reviewed de novo ), review denied (Minn. Aug. 25, 2015). "[W]e may affirm a grant of summary judgment if it can be sustained on any grounds." John Doe 76C v. Archdiocese of St. Paul , 817 N.W.2d 150, 163 (Minn. 2012). Matters of statutory interpretation are also reviewed de novo. Cocchiarella v. Driggs , 884 N.W.2d 621, 624 (Minn. 2016).
*482 A statutory city "has no inherent powers beyond those expressly conferred by statute or implied as necessary in aid of those powers which have been expressly conferred." Harstad v. City of Woodbury , 916 N.W.2d 540, 545 (Minn. 2018) (quotation omitted). If no statutes provide authority for a statutory city to act in a particular way, the city's actions are improper. See Mathews v. City of Village of Minnetonka Beach , 899 N.W.2d 881, 883 (Minn. App. 2017) (reversing city's resolution for lack of statutory authority).
Baxter relies on four statutes as authority to impose its revenue-raising franchise fee on BPUC. When addressing statutory authority, "[t]he object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature. Every law shall be construed, if possible, to give effect to all its provisions." Minn. Stat. § 645.16 (2018). "If the meaning of a statute is unambiguous, we interpret the statute's text according to its plain language." Brua v. Minn. Joint Underwriting Ass'n , 778 N.W.2d 294, 300 (Minn. 2010). We use Minn. Stat. § 645.08 (2018) to determine a statute's plain meaning. Laase v. 2007 Chevrolet Tahoe , 776 N.W.2d 431, 435 (Minn. 2009). We address each statute in turn.
A. Chapter 216B
Baxter argues it has authority to enforce its franchise fee by ordinance pursuant to chapter 216B because: (1) a franchise fee may be imposed on a municipal utility providing service outside its border, and (2) BPUC is a separate entity from Brainerd and is therefore a "public utility." Baxter's theories are unavailing because they are inconsistent with the statute's plain language.
Pursuant to Minn. Stat. § 216B.36, a public utility that furnishes utility services to a municipality "may be required to obtain a license, permit, right, or franchise in accordance with the terms, conditions, and limitations of regulatory acts of the municipality, including the placing of distribution lines and facilities underground." This requirement may include that the public utility "pay to the municipality fees to raise revenue or defray increased municipal costs accruing as a result of utility operations, or both." Minn. Stat. § 216B.36.
The legislature included a specific definition for "public utility" in chapter 216B applicable to section 216B.36, and that definition excludes municipalities. See Minn. Stat. § 216B.02, subds. 1, 4 (defining "public utility" as "not includ[ing] ... a municipality"). We have concluded that the statute's language, on its face, "mandates that municipal utilities are excepted from regulation under chapter 216B, 'except as specifically provided herein.' " In re Comm'n's Jurisdiction Over Hutchinson's Intrastate Nat. Gas Pipeline , 707 N.W.2d 223, 227 (Minn. App. 2005) (Hutchinson ) (quoting Minn. Stat. § 216B.01 ), review denied (Minn. Mar. 14, 2006); cf. N. Nat. Gas Co. v. Minn. Pub. Serv. Comm'n , 292 N.W.2d 759, 763-64 (Minn. 1980) (recognizing the "broad public purpose" of section 216B.01 and the "specific language of section 216B.02, subd. 4," provides that, absent a listed exception, an entity constitutes a public utility for regulating under chapter 216B).
Baxter acknowledges that the legislature excluded municipal utilities from regulation under chapter 216B but asserts two grounds for this court to extend the scope of the statute to permit the revenue-raising fee pursuant to chapter 216B: (1) BPUC is operating its utility outside its municipality's border, and (2) BPUC should not be recognized as a municipal utility.
*483 Baxter's first theory-which challenges the legislature's policy decision-does not have support in the statute's language. "[T]his court cannot add to a statute what the legislature has either purposefully omitted or inadvertently overlooked." Christiansen v. Univ. of Minn. Bd. of Regents , 733 N.W.2d 156, 159 (Minn. App. 2007), review denied (Minn. Aug. 21, 2007). It is the duty of the judiciary to "interpret the policy that the Legislature has already determined in the statutory language at issue." In re Guardianship of Tschumy , 853 N.W.2d 728, 741 n.10 (Minn. 2014). This court is limited to "correcting errors" and not creating public policy. LaChapelle v. Mitten , 607 N.W.2d 151, 159 (Minn. App. 2000), review denied (Minn. May 16, 2000). Any change to a statute's language "must come from the legislature." Martinco v. Hastings , 265 Minn. 490, 122 N.W.2d 631, 638 (1963). The plain language of Minn. Stat. §§ 216B.02, subd. 4, and .36 unambiguously does not authorize the revenue-raising franchise fee imposed by Baxter in ordinance 2016-023 because BPUC is excluded from the definition of public utility by operation of section 216B.02, subdivision 4. See Hutchinson , 707 N.W.2d at 227 (holding municipalities are exempt from application of chapter 216B unless an exception applies).
Second, Baxter asserts that Brainerd's establishment of BPUC as an independent commission deprives BPUC of a municipal-utility status. The undisputed facts show that Brainerd established BPUC to control, operate and manage the electric system. Although BPUC can act on its own to institute, prosecute, and defend on behalf of Brainerd, Brainerd continues to exercise control over BPUC. The Brainerd treasury retains revenue from BPUC's operation, the Brainerd city council approves BPUC's exercise of power to appoint and employ individuals to perform BPUC's duties, and the Brainerd city council exercises authority to approve BPUC's budget. Given the manner by which Brainerd controls BPUC, its existence as a separate entity does not deprive its status as a municipal utility. See Johnson v. Princeton Pub. Utils. Comm'n , 899 N.W.2d 860, 866-67 (Minn. App. 2017) (recognizing a municipal utility is a "political subdivision" for application of preverdict interest rate under Minn. Stat. § 549.09, subd. 1(c)(1)(i) (2016) ). Baxter, therefore, cannot impose its revenue-raising franchise fee on Brainerd and BPUC by relying on chapter 216B because that act, by its plain language, excludes BPUC.
B. Minn. Stat. § 222.37, subd. 1
Baxter contends that section 222.37, subdivision 1, requires Brainerd and BPUC to receive Baxter's consent to operate within Baxter's right-of-way and authorizes its franchise fee. This argument is also unavailing due to the preexisting nature of BPUC providing service within Baxter and because Baxter is not regulating but, instead, raising revenue.
Pursuant to Minn. Stat. § 222.37, subd. 1, the legislature subjected utilities to municipal regulation. N. States Power Co. v. City of Oakdale , 588 N.W.2d 534, 539 (Minn. App. 1999). This statute provides that an electric power company "may use public roads for the purpose of constructing, using, operating, and maintaining lines, ... [or] conduits ... for their business, but such lines shall be so located as in no way to interfere with the safety and convenience of ordinary travel along or over the same." Minn. Stat. § 222.37, subd. 1. An electric power company "shall be subject to all reasonable regulations imposed by the governing body of any county, town or city in which such public road may be[ ]" when constructing and maintaining *484 its lines or conduit. Id. The statute, moreover, provides:
Nothing herein shall be construed to grant to any person[7 ] any rights for the maintenance of a ... light, heat, power system, ... within the corporate limits of any city until such person shall have obtained the right to maintain such system within such city or for a period beyond that for which the right to operate such system is granted by such city.
Id.
Baxter acknowledges that, by the wording of its ordinance, it is not seeking to regulate BPUC but, instead, to raise revenue. Ordinance 2016-023's express purpose is:
The Baxter City Council has determined that it is in the best interest of the City to impose a franchise fee on those public utility companies that provide electric services within the City of Baxter to fund pavement management related and street and traffic lighting related activities.
Baxter does not identify, and this court cannot find, any provision in ordinance 2016-023 that ties the franchise fee payment to allow BPUC to operate in the city. Thus, Minn. Stat. § 222.37, subd. 1, does not confer authority on Baxter to impose its revenue-raising fee upon BPUC.
Baxter also relies on this court's language in U S W. Commc'ns, Inc. v. City of Redwood Falls , 558 N.W.2d 512, 515 (Minn. App. 1997) (Redwood Falls ), review denied (Minn. Apr. 15, 1997), in support of its assertion that section 222.37, subdivision 1, permits its franchise fee. In that case, we held that the city lacked authority to impose a fee because specific provisions in a different chapter "evidence[d] a legislative intent to abolish the right of municipalities to require a franchise from a telephone company." Redwood Falls , 558 N.W.2d at 516. Although gas and electric utilities were not at issue, this court noted "the legislature never repealed sections 300.03, 300.04, and 222.37, which purportedly continue to authorize municipal franchising and regulation of public corporations."[8] Id. at 515 (emphasis added). It is this latter language which Baxter claims supports its imposition of a franchise fee based upon this statute. We disagree.
Although Redwood Falls references the purported authority granted under Minn. Stat. § 222.37, subd. 1, to authorize municipal franchising, this court had not been asked to define the scope of the statute. The statute's language determines the scope of Baxter's authority.
This unambiguous statute does not include language that would permit Baxter to impose a revenue-raising franchise fee on BPUC. Baxter relies on Minn. Stat. § 222.37, subd. 1, to support its franchise fee because it permits municipalities to impose regulations when a utility uses the city's right-of-ways and requires a right to operate in a city.
Beginning with Baxter's assertion that its franchise fee is a regulation-which is specifically authorized by this statute-we are not convinced. The statute does not define the nature of regulations authorized. "In the absence of a statutory definition, we generally give statutory terms their common meaning."
*485 Nelson v. Schlener , 859 N.W.2d 288, 293 (Minn. 2015) ; see also Minn. Stat. § 645.08(1) (stating that "words and phrases are construed according to the rules of grammar and according to their common and approved usage[ ]"). We may "consider[ ] dictionary definitions as a helpful tool in determining plain and ordinary meaning." See Shire v. Rosemount, Inc. , 875 N.W.2d 289, 297 (Minn. 2016).
A regulation is the ability to exercise "[c]ontrol over something by rule or restriction." Black's Law Dictionary 1475 (10th ed. 2014); see also American Heritage Dictionary of the English Language 1481 (5d ed. 2011) (defining "regulation" as "[a] principle, rule, or law designed to control or govern conduct"). Rather than controlling BPUC's use of Baxter's right-of-ways, Baxter seeks to extract a fee from the utility based on its service to any Baxter residents. Ordinance 2016-023 identifies its purpose as a funding source for its pavement management, and street- and traffic-lighting activities which disconnects the fee from regulating the city's right-of-ways. Baxter's fee, accordingly, exceeds the statute's authority for the city to regulate actions that use the city's right-of-ways.
Baxter, alternatively, argues that its fee functions as a requirement for BPUC to operate in the city. Baxter's asserted authority is not supported by the plain meaning of the statute.
The statute's language requires a power company to obtain a "right to operate" from the city. Minn. Stat. § 222.37, subd. 1. The legislature's choice of "right to operate" is notably different from the language in Minn. Stat. § 216B.36, which expressly allows a revenue-raising fee to be imposed on qualifying public utilities. The plain meaning of "right to operate" in section 222.37, subdivision 1, is that a city grants permission to the utility to service the area. For example, the City of Redwood Falls imposed fees on the utility for installing telephone lines in the right-of-ways and for an easement for the location of the lines. Redwood Falls , 558 N.W.2d at 514. The City of Redwood Fall's fees related to operation of the utility. Even if BPUC had not been a preexisting utility within Baxter such that it needed the consent of Baxter to provide the service, Baxter's argument fails because its requested fees do not correspond to BPUC's operation in the right-of-ways.
The supreme court's recent decision in Harstad , although it analyzed a different statute, supports our interpretation of section 222.37, subd. 1, and its reasoning is instructive. 916 N.W.2d at 547-48. In Harstad , the supreme court held that a statutory city's imposition of a fee pursuant to Minn. Stat. § 462.358, subd. 2a (2016), exceeded the city's authority because the legislature did not use the precise terms required to permit the city's actions. Id. at 543, 547-48. The City of Woodbury imposed an infrastructure charge on Harstad, a developer, to offset costs to the city resulting from additional traffic generated by a residential development in the city. Id. at 543. The City of Woodbury relied on Minn. Stat. § 462.358, subd. 2a, which allows a city to condition approval of a subdivision development application "on the developer (a) constructing or installing the improvements or (b) providing a form of financial security that is sufficient to assure the city that the improvements will be constructed or installed according to the specifications of the city." Id. at 546 (quotation marks and quotation omitted). The city asserted that the infrastructure charge constituted financial security as permitted by the statute. Id. at 546-47.
The supreme court, however, held the statute did not permit imposition of the charge for road construction because the *486 statute was not "designed to provide [the city] with financial security." Id. at 548.
Had the Legislature intended to authorize a city to condition subdivision approval on a cash fee for infrastructure improvements, it would have used those precise terms, in subdivision 2a, as it did in subdivision 2b. The Legislature did not do so. Instead, it used financial security terms such as cash deposit and certified check.
Id. at 547-48 (quotation marks omitted).
Like the statute at issue in Harstad , Minn. Stat. § 222.37, subd. 1, does not include language permitting Baxter to impose a revenue-raising fee on a utility as part of a right to continue operation. Had the legislature intended to permit the use of section 222.37, subdivision 1, to allow for a revenue-raising fee, that language would appear in the statute. Unlike in Minn. Stat. § 216B.36, where the legislature permitted a revenue-raising fee on qualifying public utilities, the legislature chose not to include similar language in Minn. Stat. § 222.37, subd. 1, and we must not add language to the statute.
C. Minn. Stat. § 301B.01
Baxter asserts that section 301B.01 confers authorization to impose a revenue-raising franchise fee, relying on the Minnesota Supreme Court's decision in Village of Blaine v. Indep. Sch. Dist. No. 12 , 272 Minn. 343, 138 N.W.2d 32, 44-45 (1965). We conclude that the facts in this case are distinguishable from those in Village of Blaine , and that the fee imposed by Baxter does not constitute compensation in accordance with the statute.[9] Specifically, the critical fact distinction is the preexistence of BPUC as an operating utility within the area that came to be within Baxter.
Pursuant to Minn. Stat. § 301B.01, a corporation cannot furnish power for public use "without first obtaining a franchise from the city conferring this right and compensating the city for it." City of Cohasset v. Minn. Power , 798 N.W.2d 50, 54 (Minn. 2011) (quotation omitted). The statute provides:
A corporation may be organized to construct, acquire, maintain, or operate internal improvements, including ... to furnish power for public use, and any work for supplying the public, by whatever means, with water, light, heat, or power, including all requisite subways, pipes, and other conduits, and tunnels for transportation of pedestrians.
Minn. Stat. § 301B.01. A corporation furnishing power in this manner cannot "construct, maintain, or operate a ... conduit, ... upon a street, alley, or other public ground of a city, without first obtaining from the city a franchise conferring this right and compensating the city for it." Id. (emphasis added). "The corporation obtaining a franchise from a city is subject to conditions and restrictions as from time to time are imposed upon it by the city." Minn. Stat. § 301B.02 (2018).
*487 The language of the statute imposes a requirement that a corporation must first obtain a franchise from the city to operate. BPUC has provided electrical service to a portion of what would become Baxter since 1935. When BPUC extended its electrical service, Baxter did not exist as an entity that could authorize a utility to operate. Baxter asserts that BPUC now needs to pay a franchise fee to operate as a preexisting utility in Baxter.
Baxter relies on the supreme court's decision in Village of Blaine to argue that a municipality may exclude a utility from operating in its locality when it did not have a franchise and, therefore, Baxter may impose its revenue-raising fee at issue. 138 N.W.2d at 44-45. There, Blaine adopted an ordinance that permitted a particular gas utility to provide for the city but Independent School District No. 12 (ISD 12)-located within the Village of Blaine-sought bids from other gas utilities. Id. at 35-36. ISD 12 executed an agreement with the Circle Pines Utility Commission to provide gas to the school. Id. at 36. The supreme court recognized "the type of utilities here involved may not operate in cities and villages without franchises from those cities and villages." Id. at 38. "Our statutes prohibit unfranchised utilities from operating competitively in any city or village in this state and thereby [circumventing] governmental control of these essential services." Id. at 39. Because Circle Pines' natural gas system would be operating in Blaine if used by ISD 12, the supreme court held Blaine's refusal to provide a franchise to Circle Pines prohibited the gas operation. Id. at 44.
Village of Blaine is factually distinguishable from this case. Minn. Stat. § 301B.01 requires that a corporation-before operating-obtain a franchise from the city. Baxter did not exist at the time BPUC began to provide its electric utility to the area of Baxter. BPUC did not operate "upon a street, alley, or other public ground of a city" because no city existed at the time. This extension of service did not require a franchise from any city, and no city could have granted such authority. Since 1939, when Baxter incorporated, BPUC has continued to provide electrical service. The statute's plain meaning does not require BPUC to obtain an operating right when the city incorporated an area within which BPUC was already providing electrical service. Further, unlike in Village of Blaine where the city refused to permit Circle Pines to begin providing service, Baxter does not assert it is disallowing BPUC to operate without paying the franchise fee. Rather, Baxter demands payment from the utility. Therefore, the BPUC's preexisting operation in Baxter does not implicate the statutory framework in Minn. Stat. § 301B.01.
In addition to the statute not being implicated in this context, Minn. Stat. § 301B.01 provides that a city may require compensation from the corporation serving as its electrical utility. The statute's language provides that a corporation formed to supply or furnish power for the public use cannot "construct, maintain, or operate a ... conduit, ... in or upon a street, alley, or other public ground of a city, without first obtaining from the city a franchise conferring this right and compensating the city for it." Minn. Stat. § 301B.01. Brainerd and BPUC argue that the statute authorizes a compensation requirement only as it relates to the construction, maintenance, or operation of the electrical system.
Baxter again relies on Village of Blaine to assert the permissible scope of a franchise fee. The supreme court in Village of Blaine expressed that "[t]he grant of a right to maintain public utilities within the *488 municipality and to exact compensation thereof is a franchise." 138 N.W.2d at 39. This broad language, however, does not define the nature of the compensation requirement authorized by section 301B.01. Village of Blaine did not address the nature of a franchise fee. It analyzed whether an entity, ISD 12, could contract with a third-party utility to provide service within the locality without permission from the municipality for that utility to operate.
We, therefore, must consider the term "compensating" in the context of the statute to determine whether Baxter's franchise fee functions as compensation. See In re Raynolds' Estate , 219 Minn. 449, 18 N.W.2d 238, 241 (1945) ("We are required to look beyond mere words and inquire into the operation of the statute."). The term "compensation" means payments for a service or loss. See American Heritage Dictionary of the English Language at 376 (defining "compensation" as "[t]he act of compensating or the state of being compensated;" and "[s]omething, such as money, given or received as payment or reparations, as for a service or loss"); Black's Law Dictionary at 342 (defining "compensation" as "[r]emuneration and other benefits received in return for services rendered; esp. salary or wages"). Section 301B.01 provides such that a "corporation ... may construct, maintain, or operate" within a city only after first obtaining the right and compensating the city for it. Compensation, within this context, is tied to the three enumerated categories where the corporation affects the city's streets, alleys, or public grounds through its operation. Minn. Stat. § 301B.01. We disagree with Baxter's interpretation of section 301B.01 because it detaches the meaning of compensation from the statute's context, which is contrary to our principles of statutory construction. Ordinance 2016-023 does not seek compensation for constructing, maintaining, or operating the utility, rather Baxter identified its purpose as funding pavement management and street- and traffic-lighting related activities. Accordingly, the fee is not authorized by section 301B.01.
D. Minn. Stat. § 412.321, subd. 3
Baxter contends that it has authority to impose a revenue-raising franchise fee pursuant to section 412.321, subdivision 3, because BPUC extended its service into the area that eventually incorporated as Baxter. The undisputed facts are that BPUC extended its service prior to Baxter's incorporation, and we do not find any language in the statute to require a preexisting utility to retrospectively seek consent from the municipality to operate its service.[10]
When a municipal utility extends its service beyond its limits, that utility implicates Minn. Stat. § 412.321, subd. 3, which provides:
Any city may, except as otherwise restricted by this section, extend any such public utility outside its limits and furnish service to consumers in such area at such rates and upon such terms as the council or utility commission, if there is one, shall determine; but no such extension shall be made into any incorporated municipality without its consent.
*489 The sale of electricity, other than surplus, outside the limits of the city shall be subject to the restriction of section 455.29.
The operative language at issue here is that "no such extension shall be made into any incorporated municipality without its consent." Minn. Stat. § 412.321, subd. 3. This language is clear that it disallows a municipal utility to extend its service without acquiring consent. The statute did not apply to BPUC's extension in 1935, and Baxter cannot rely on it as a basis to require BPUC to be subject to its revenue-raising fee. Nothing in the language of section 412.321, subdivision 3, requires retrospective consent for an extension which preexisted the creation of the city. Based on the undisputed factual circumstances in this case, we conclude that Minn. Stat. § 412.321, subd. 3, does not authorize Baxter's revenue-raising franchise fee.
DECISION
Because Baxter lacked authority to impose a revenue-raising franchise fee on BPUC, we reverse and remand for the district court to enter judgment in favor of Brainerd and BPUC.
Reversed and remanded.

"The term 'statutory city' means any city which has not adopted a home rule charter ...." Minn. Stat. § 410.015 (2018).

Baxter did not codify ordinance 2016-023; accordingly, the ordinance does not appear in the Minnesota Code of Ordinances.

Baxter imposed similar franchise-fee ordinances on private companies and the cooperative association serving its area. The other utilities did not join in this litigation.

Pursuant to Minn. Stat. § 216B.39, subd. 2 (2018): "[T]he [MPUC] shall after notice and hearing establish the assigned service area or areas of each electric utility and shall prepare or cause to be prepared a map or maps to accurately and clearly show the boundaries of the assigned service area of each electric utility."

Minnesota is divided into retail electric service areas designated by the MPUC and "a specified electric utility shall provide electric service to customers on an exclusive basis." Minn. Stat. § 216B.37 (2018). The MPUC may alter a utility's service area if the change would result in a more efficient, reliable, and cost-effective service, or if it would serve the public interest. In re City of White Bear Lake's Request for an Elec. Util. Serv. Area Change within Its City Limits , 443 N.W.2d 204, 206-08 (Minn. App. 1989), review denied (Minn. Sept. 21, 1989).

The district court also held that the revenue-raising fee was not preempted by Minn. Stat. §§ 216B.01 -.82 (2018). Because we conclude that Baxter lacks authority to impose the revenue-raising fee at issue in this case, we do not address the preemption issue.

Pursuant to Minn. Stat. § 645.44, subd. 7 (2018): " 'Person' may extend and be applied to bodies politic and corporate, and to partnerships and other unincorporated associations."

Minn. Stat. §§ 300.03 -.04 (1996) contains language now referenced in Minn. Stat. §§ 301B.01 -.02 (2018). 2005 Minn. Laws ch. 69, art. 1, § 21, at 372-73 (renumbering Minn. Stat. §§ 300.03 -.04 (2004) to Minn. Stat. §§ 301B.01 -.02 (2006)).

We acknowledge appellants also challenge application of section 301B.01 based on the use of the term "corporation." Brainerd and BPUC argue BPUC is a municipal corporation and pursuant to Poynter v. Otter Tail County , 223 Minn. 121, 25 N.W.2d 708, 716 (1947), it is presumed the legislature would use additional language to clarify that the term "corporation" includes municipal corporations. Baxter relies on the supreme court's decision in Abrahamson v. St. Louis Cty. Sch. Dist. , 819 N.W.2d 129, 134 (Minn. 2012), which held the legislature's use of the term "corporation" without any limitation to its scope is indicative of an intent to encompass all forms of corporations, including public corporations. Because this matter is resolved on other grounds, we do not address this apparent conflict.

An additional concern raised by appellants is that the statute does not identify that an incorporated municipality may impose a financial condition on its consent for a utility to extend its service into the area. Appellants present this claim in light of the supreme court's recent decision in Harstad . See 916 N.W.2d at 547-48. Because this matter is addressed by interpreting the language of the statute as requiring consent before extending service, which could not occur on the facts of this case, we do not address the language of the statute regarding a financial obligation that may or may not be imposed.