## PANHANDLE EASTERN PIPE LINE CO. *v.* MICHIGAN PUBLIC SERVICE COMMISSION ET AL.

No. 486.   Argued April 23, 1951.—Decided May 14, 1951.

*Robert P. Patterson* argued the cause for appellant. With him on the brief was *Clayton F. Jennings.*

*Edmund E. Shepherd,* Solicitor General of Michigan, argued the cause for the Michigan Public Service Commission, appellee. With him on the brief were *Frank G. Millard,* Attorney General, *Daniel J. O'Hara* and *Charles M. A. Martin,* Assistant Attorneys General. *Stephen J. Roth,* then Attorney General, was also of counsel.

*Donald R. Richberg* argued the cause for the Michigan Consolidated Gas Co., appellee. With him on the brief were *Clifton G. Dyer* and *James W. Williams.*

*Solicitor General Perlman, Robert L. Stern, Bradford Ross* and *Bernard A. Foster, Jr.* filed a memorandum for the Federal Power Commission, as *amicus curiae.*

MR. JUSTICE MINTON delivered the opinion of the Court.

This is an appeal from the affirmance of an order of the Michigan Public Service Commission requiring appellant to obtain a certificate of public convenience and necessity before selling natural gas direct to industrial consumers in a municipality already served by a public utility.

Appellant is engaged in the transportation of natural gas by pipe line from fields in Texas, Oklahoma and Kansas into areas which include the State of Michigan. Appellant is a "natural-gas company" within the coverage of the Natural Gas Act, 52 Stat. 821, 15 U. S. C. §§ 717 *et seq.,* and subject thereunder to regulation by the Federal Power Commission. Appellee Michigan Consoli-

dated Gas Company is a public utility of Michigan which under appropriate authorization distributes gas to domestic, commercial and industrial consumers in and around Detroit. Consolidated obtains its entire supply of natural gas for distribution in the Detroit district from appellant.

In 1945 appellant publicly announced a program of securing large industrial customers for the direct sale of natural gas in Michigan. In Detroit it offered to pay the City for the right to lay and operate its pipe line along the streets and alleys directly to large industrial customers. In October of that year appellant succeeded in securing a large direct-sale contract with the Ford Motor Company for gas at its Dearborn plant, located in the Detroit district. Ford was already purchasing substantial quantities of gas for industrial use at the Dearborn plant from Consolidated.

Believing its interests and those of its customers were prejudiced by appellant's program, particularly the Ford contract, Consolidated filed a complaint with the Michigan Public Service Commission. Appellant appeared to contest the jurisdiction of the Commission over such sales. After hearing, the Commission ordered appellant to—

> "cease and desist from making direct sales and deliveries of natural gas to industries within the State of Michigan, located within municipalities already being served by a public utility, until such time as it shall have first obtained a certificate of public convenience and necessity from this Commission to perform such services." [1]

---

[1] The Commission acted under authority of Mich. Comp. Laws, 1948, § 460.502, which provides:

"Sec. 2. No public utility shall hereafter begin the construction or operation of any public utility plant or system thereof nor shall it render any service for the purpose of transacting or carrying on a

Appellant obtained an injunction against the order of the Commission in the Circuit Court of Ingham County, Michigan. The Circuit Court held that the order was a prohibition of interstate commerce and therefore invalid. The Supreme Court of Michigan, three judges dissenting, reversed the Circuit Court and affirmed the Commission's order. 328 Mich. 650, 44 N. W. 2d 324. That court rejected the argument that the order of the Commission was an absolute denial of the right of appellant to sell natural gas in Michigan direct to consumers. Since appellant was free to make application to the Michigan Commission for a certificate of public convenience and necessity as to such sales, the order was construed as denying the right of appellant to sell direct without first obtaining such certificate. The court held this require-

local business either directly, or indirectly, by serving any other utility or agency so engaged in such local business, in any municipality in this state where any other utility or agency is then engaged in such local business and rendering the same sort of service, or where such municipality is receiving service of the same sort, until such public utility shall first obtain from the commission a certificate that public convenience and necessity requires or will require such construction, operation, service, or extension."

Other relevant sections of the Michigan statute provide:

"Sec. 3. Before any such certificate of convenience and necessity shall issue, the applicant therefor shall file a petition with the commission stating the name of the municipality or municipalities which it desires to serve and the kind of service which it proposes to render, and that the applicant has secured the necessary consent or franchise from such municipality or municipalities authorizing it to transact a local business." § 460.503.

"Sec. 5. In determining the question of public convenience and necessity the commission shall take into consideration the service being rendered by the utility then serving such territory, the investment in such utility, the benefit, if any, to the public in the matter of rates and such other matters as shall be proper and equitable in determining whether or not public convenience and necessity requires the applying utility to serve the territory. . . ." § 460.505.

ment to be within the State's regulatory authority despite the interstate character of the sales. This appeal challenges the correctness of that decision.

The sale to industrial consumers as proposed by appellant is clearly interstate commerce. *Panhandle Pipe Line Co.* v. *Public Service Comm'n of Indiana,* 332 U. S. 507, 513; *Pennsylvania Gas Co.* v. *Commission,* 252 U. S. 23, 28. But the sale and distribution of gas to local consumers made by one engaged in interstate commerce is "essentially local" in aspect and is subject to state regulation without infringement of the Commerce Clause of the Federal Constitution. In the absence of federal regulation, state regulation is required in the public interest. *Pennsylvania Gas Co.* v. *Commission, supra,* at 31. See also opinion of Cardozo, J., in *Pennsylvania Gas Co.* v. *Commission,* 225 N. Y. 397, 122 N. E. 260. These principles apply to direct sales for industrial consumption as well as to sales for domestic and commercial uses. *Panhandle-Indiana, supra,* at 514, 519–520.

The facts in the instant case show that the proposed sales are primarily of local interest. They emphasize the need for local regulation and the wisdom of the principles just discussed. To accommodate its operations, appellant proposes to use the streets and alleys of Detroit and environs. A local utility already operating in the same area, Consolidated, receives its entire supply of natural gas from appellant. A substantial portion of Consolidated's revenues is derived from sales to large industrial consumers. Appellant ignored requests of Consolidated for additional gas to meet the increased wants of its industrial customers. Instead of attempting to meet increased needs through Consolidated, appellant launched a program to secure for itself large industrial accounts from customers, some of whom were already being served by Consolidated. In connection with the Ford Motor Company, it is note-

worthy that the tap line by which appellant proposed to serve Ford directly would be substantially parallel to and only a short distance from the existing tap line by which Consolidated now serves Ford.

Thus, not only would there be two utilities using local facilities to accommodate their distribution systems, but they would be seeking to serve the same industrial consumers. Appellant asserts a right to compete for the cream of the volume business without regard to the local public convenience or necessity. Were appellant successful in this venture, it would no doubt be reflected adversely in Consolidated's over-all costs of service and its rates to customers whose only source of supply is Consolidated. This clearly presents a situation of "essentially local" concern and of vital interest to the State of Michigan.

Of course, when Congress acts in this field it is supreme. It has acted. Section 1 (b) of the Natural Gas Act, *supra,* provides as follows:

> "The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

By this Act Congress occupied only a part of the field. As to sales, only the sale of gas in interstate commerce for resale was covered. Direct sales for consumptive use were designedly left to state regulation. *Panhandle-Indiana,* 332 U. S. at 516–518. Speaking further of the divi-

sion of regulatory authority over interstate commerce in natural gas, this Court said in the same case:

"It would be an exceedingly incongruous result if a statute so motivated, designed and shaped to bring about more effective regulation, and particularly more effective state regulation, were construed in the teeth of those objects, and the import of its wording as well, to cut down regulatory power and to do so in a manner making the states less capable of regulation than before the statute's adoption. Yet this, in effect, is what appellant asks us to do. For the essence of its position, apart from standing directly on the commerce clause, is that Congress by enacting the Natural Gas Act has 'occupied the field,' i. e., the entire field open to federal regulation, and thus has relieved its direct industrial sales of any subordination to state control.

"The exact opposite is the fact. Congress, it is true, occupied a field. But it was meticulous to take in only territory which this Court had held the states could not reach. That area did not include direct consumer sales, whether for industrial or other uses. Those sales had been regulated by the states and the regulation had been repeatedly sustained. In no instance reaching this Court had it been stricken down.

. . . . .

"The Natural Gas Act created an articulate legislative program based on a clear recognition of the respective responsibilities of the federal and state regulatory agencies. It does not contemplate ineffective regulation at either level. We have emphasized repeatedly that Congress meant to create a comprehensive and effective regulatory scheme, complementary in its operation to those of the states and in no manner usurping their authority. . . .

And, as was pointed out in *Power Comm'n* v. *Hope Gas Co.*, [320 U. S. 591] at 610, 'the primary aim of this legislation was to protect consumers against exploitation at the hands of natural gas companies.' The scheme was one of cooperative action between federal and state agencies. It could accomplish neither that protective aim nor the comprehensive and effective dual regulation Congress had in mind, if those companies could divert at will all or the cream of their business to unregulated industrial uses." 332 U. S. at 519, 520–521.

The statutory scheme of "dual regulation" might have some overlaps or conflicts but no such exigencies appear here. There are no opposing directives and hence no necessity for us to resolve any conflicting claims as between state and federal regulation.

Appellant concedes, as it must, that direct sales by it to industrial consumers are subject to state *rate* regulation under the *Panhandle-Indiana* decision. It contends, however, that that decision does not comprehend its problem, reasoning that the jurisdiction here asserted by the Michigan Commission is the power to prohibit interstate commerce in natural gas.

Although the end result might be prohibition of particular direct sales, to require appellant to secure a certificate of public convenience and necessity before it may enter a municipality already served by a public utility is regulation, not absolute prohibition. There is no intimation that appellant cannot deliver and sell available gas to Consolidated for resale to customers who have additional gas requirements. It is no discrimination against interstate commerce for Michigan to require appellant to route its sales of gas through the existing certificated utility where the public convenience and necessity would not be served by direct sales. That there is neither discrimination nor prohibition here saves this regulation from the

rule of such cases as *Hood & Sons* v. *Du Mond,* 336 U. S. 525, relied on by appellant, where a state was said to have discriminated against interstate commerce by *prohibiting* it because it would subject local business to competition. And the statute under which the Michigan Commission acted does not distinguish between an interstate or intra-state agency desiring to operate in a locality already served by a utility.[2]  See *Cities Service Co.* v. *Peerless Co.,* 340 U. S. 179, 188.

It does not follow that because appellant is engaged in interstate commerce it is free from state regulation or free to manage essentially local aspects of its business as it pleases.  The course of this Court's decisions recognizes no such license.  See *Cities Service* case, *supra; Panhandle-Indiana* case, *supra; Pennsylvania Gas Co.* v. *Commission,* 252 U. S. 23.  Such a course would not accomplish the effective dual regulation Congress intended, and would permit appellant to prejudice substantial local interests.  This is not compelled by the Natural Gas Act or the Commerce Clause of the Constitution.

*Judgment affirmed.*

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE DOUGLAS joins, dissenting.

Panhandle seeks to sell natural gas from its fields in Texas, Oklahoma and Kansas directly to the Ford Motor Company at its Dearborn plant in Michigan.  Concededly this is the clearest kind of interstate commerce.  We have not here in controversy Panhandle's desire to lay pipes in the public highways of Michigan and the power of Michigan to make exactions for such privileges so long as it does not offend the doctrine of unconstitutional conditions.  Michigan here is asserting a wholly different claim.  The State claims the right to say whether an out-

---

[2] See note 1, *supra.*

of-State seller may be permitted to compete with Michigan distributors in the sale of natural gas to Michigan industrial consumers. Michigan says that it may determine that the local market is saturated and that, since the entry of an out-of-State distributor may disadvantage or disrupt the local market, it may deny him leave to make such sales.

The right here asserted by Michigan to prohibit Panhandle from furnishing gas directly to consumers has, since 1938, by virtue of the Natural Gas Act, been lodged in the Federal Power Commission. We are advised by the Commission that it has exercised in multitudinous instances authority over transportation for direct sale to consumers. "It is, of course, true," adds the Commission, "that a state certificate authorizing an interstate sale to an industrial consumer would be meaningless if the Federal Commission can deny a certificate for the necessary transportation facility, and *vice versa.*" If this means anything it means that the control which Michigan here claims is within the effective authority of the Federal Power Commission. The Federal Power Commission may deny a certificate for transportation of gas by Panhandle to the Ford Motor Company for the same reasons that Michigan would rely upon in withholding a certificate of convenience and necessity to Panhandle to sell its gas to Ford. Questions of conservation, of market stability, of cut-throat competition and the like would be relevant factors in one case as well as in the other. The Commission is clear that the power of Michigan is subordinate to its authority, so that Michigan could not frustrate the Commission's authority in granting or denying to Panhandle the right to enter Michigan for direct sale to consumers.

The inference to be drawn from the Commission's position is that, since Panhandle needs the Commission's cer-

tificate for the physical transportation of the gas to Ford, it cannot in any event make such sale to Ford prior to the issuance of the certificate. Howsoever this be, the Court has placed the case in a different focus. It is suggested that until there is an actual clash between an order of the Commission and the order now assailed there is a vacuum which Michigan may enter. No doubt Congress could give the States authority over such a field of interstate commerce and deny it to the Commission or give it to the States until supplanted by Commission action. It has done neither. The problem therefore remains what it was under the law of the Commerce Clause before the enactment of the Natural Gas Act.

The problem does not disappear by invoking a solving phrase, "regulation, not absolute prohibition." The Commerce Clause sought to put an end to the economic autarchy of the States. It is not for Michigan to determine what competition she will or will not allow from without, subject, of course, to her right to protect those State interests which are implied by the now threadbare phrase that interstate commerce must also pay its way, or to protect local interests that only incidentally or insignificantly touch interstate or foreign commerce. *E. g., Union Brokerage Co.* v. *Jensen,* 322 U. S. 202.

If there were no Constitution with a Commerce Clause, each State could shut out the products of other States or admit them on conditions. Under the Constitution such commerce belongs not to the States but to Congress. It is not for the States, in pursuit of local State policies, to decide what products from without may cross State boundaries or admit them on condition that they satisfy local economic policy. If as a matter of national policy States are to have such power, Congress must give it to them, as it did in the case of liquor, prison-made goods, and insurance. See Act of Aug. 8, 1890, 26 Stat.

313, 27 U. S. C. § 121; Act of July 24, 1935, 49 Stat. 494; Act of Aug. 10, 1939, 53 Stat. 1391, 26 U. S. C. § 1606 (a); Act of Mar. 9, 1945, 59 Stat. 34, 15 U. S. C. § 1012 (b).

Against the inherent right of a State to keep out except by its leave the products or services from other States, the decisions in *Buck* v. *Kuykendall,* 267 U. S. 307, and *Bush Co.* v. *Maloy,* 267 U. S. 317, seem to me decisive.

What Mr. Justice Brandeis, speaking for the entire Court, excepting only Mr. Justice McReynolds, said in the *Buck* case defines the situation here. There, as here, the Court was confronted with a State statute requiring a certificate of convenience and necessity. The regulation related to passenger and freight busses. There was no outright prohibition, but of course such a system of certification is based on the duty of denying access to the market if the community is already adequately served. Such a scheme "determines whether the prohibition shall be applied by resort, through state officials, to a test which is peculiarly within the province of federal action— the existence of adequate facilities for conducting interstate commerce. . . . Thus, the provision of the Washington statute is a regulation, not of the use of its own highways, but of interstate commerce. Its effect upon such commerce is not merely to burden but to obstruct it. Such state action is forbidden by the Commerce Clause." 267 U. S. at 316.

It is easy to mock or minimize the significance of "free trade among the states," *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511, 526, which is the significance given to the Commerce Clause by a century and a half of adjudication in this Court. With all doubts as to what lessons history teaches, few seem clearer than the beneficial consequences which have flowed from this conception of the Commerce Clause. It is true of this principle, as of others, that the principle is not to be reduced to the appeal of the particular instance in which it is invoked.