CITY OF SAINT PAUL, Appellant,

v.

NORTHERN STATES POWER COMPA-
NY, Centran Corporation, Enron Gas
Marketing, Inc., Respondents.

No. C5–89–1687.

Court of Appeals of Minnesota.

Jan. 23, 1990.

Review Granted March 22, 1990.

Edward P. Starr, City Atty., Philip B. Byrne, Asst. City Atty., St. Paul, for appellant.

Samuel L. Hanson, Michael C. Krikava, Briggs and Morgan, Gene R. Sommers, Minneapolis, for Northern States Power Co.

John P. Martin, Kevin J. Dunlevy, Petersen, Tews and Squires, P.A. Minneapolis, for Centran Corp.

Elmer B. Trousdale, Michele L. Courneya, Oppenheimer, Wolff & Donnelly, St. Paul, for Enron Gas Marketing, Inc.

* Acting as judge of the Court of Appeals by ap-

Heard, considered and decided by CRIPPEN, P.J., and GARDEBRING, and FLEMING,* JJ.

## OPINION

FLEMING, Judge.

Appellant City of St. Paul brought an action for a declaratory judgment to the effect that respondent NSP had violated its franchise agreement with the city by entering into contracts with retail customers of respondents EGM and Centran to transport natural gas through NSP pipelines from a point outside the city to the customers within city limits. The natural gas in question was sold by EGM and Centran to the St. Paul customers with the express understanding that the gas was to be delivered to the customer at NSP's "town border station" (TBS) outside the city limits. NSP took possession of the gas at its TBS as agent for the end user, and transported the gas to the end user through its pipes within the city limits. NSP charged the end user only for transportation of the gas, and paid its franchise fee to the city on the transportation charge.

The city alleged that this arrangement violated its agreement with NSP, and that the city was losing money because NSP was not collecting the franchise fee on the entire price of the commodity, but only on the transportation charges. The city requested declarations prohibiting NSP from transporting gas to retail customers within the city when such gas has been sold by non-franchised suppliers, and prohibiting EGM and Centran from selling gas at retail to customers within the city without a franchise. The city also requested injunctive relief, damages, and such other relief as may be appropriate.

The trial court granted summary judgment in favor of NSP, EGM and Centran, noting in its memorandum/order that neither EGM nor Centran operates a public utility within the city, and therefore they are not required to obtain a franchise or pay a franchise fee for gas sold to customers in St. Paul. The City of St. Paul ap-

pointment pursuant to Minn. Const. art. VI, § 2.

peals the entry of judgment on the trial court's order.

## FACTS

Chapter 16 of the St. Paul City Charter, entitled "Franchises," provides that:

Except as otherwise provided by law, no person, firm or corporation shall place or maintain any permanent or semipermanent fixtures in, over, upon, or under any street or public place for the purpose of operating a public utility without a franchise therefor from the city. A franchise shall be granted only by ordinance, which shall not be an emergency ordinance. Every ordinance granting a franchise shall contain all the terms and conditions of the franchise. * * *

St. Paul City Charter, § 16.01 (1985).

Under § 16.06 of the City Charter, the corporation or person exercising the franchise "in, over, under, or upon any of the streets or public places or elsewhere in the city," is required to pay a franchise fee of "at least five percent of the gross earnings derived or accruing from the exercise or enjoyment within the city of the franchise."

Pursuant to the City Charter, the St. Paul City Council adopted Ordinance No. 17210 on February 12, 1985. This ordinance grants to NSP, "a public service corporation supplying gas for all purposes within the City of St. Paul, * * * a franchise to use the streets and other public property located in such City for such purpose for a term extending from April 1, 1985, to March 31, 1996."

This gas franchise ordinance is required by Section 16.01 of the City Charter to "contain all the terms and conditions of the franchise." The following terms and conditions of the franchise ordinance are relevant to the issues in this case:

Section 2. The franchise granted herein shall extend to the Company's use of all streets and public property now being used by the Company in connection with such service and of such other streets and public property as may from time to time be designated by the City. Such franchise to use the streets and other public property located in such City shall include such use for the purpose of erecting, installing, and operating gas mains, and all other necessary appurtenances used in conducting, distributing, and supplying gas for public and private use and for the purpose of conducting said gas to and through the City.

\* \* \* \* \* \*

Section 5.

(A) During the term of the franchise hereby granted * * * the Company shall pay into the treasury of the City of St. Paul a franchise fee equal to the percentages hereinafter set forth of the Company's gross earnings as hereinafter defined * * *.

(B) * * * The term "gross earnings" means all sums * * * received by the Company from the sale of gas distributed and used within the corporate limits of the City * * *. The franchise fee shall be in the amount of the percentages set forth below on that portion of gross revenues derived from sales to the designated classification of the Company's customers * * *.

Section 6. The gas service of Company and the rates to be charged by Company for gas service in the City shall be subject to the jurisdiction of the Public Utilities Commission of this State. * * *

\* \* \* \* \* \*

Section 13. Upon any breach or failure to comply with any of the terms or conditions of this franchise ordinance, either party may bring an action at law or in equity to seek compliance by the other with the said terms and conditions, money damages, or any other appropriate relief which may include but is not limited to termination and forfeiture of the franchise granted herein.

The facts surrounding the transactions in question are undisputed. In 1985, after the franchise ordinance was enacted, the Federal Energy Regulatory Commission ("FERC") issued Order 436, which changed the structure of the natural gas industry. FERC Order 436 created a new regulatory scheme, the purpose of which was to increase end user (customer) options, and to

encourage greater competition in the natural gas market. Among other things, FERC Order 436 created a system under which end users could purchase gas directly from a provider or marketer, and require transportation of the gas through designated "open access" pipelines.

The City of St. Paul is served by a single natural gas pipeline, owned and operated by Northern Natural Gas Company. Northern has been certified as an "open access" transporter, which means that it must transport gas on a nondiscriminatory basis for any shipper requesting such service (and paying appropriate transportation fees). Northern Natural Gas transports gas to NSP's town border stations for local distribution. NSP then transports the gas, through its own pipelines, to customers within the City of St. Paul.

In June 1987, the Minnesota Public Utilities Commission (MPUC) approved tariffs proposed by NSP for provision of transportation services from its town border stations to end users who purchase their natural gas directly from a marketer (such as EGM or Centran) or a producer. NSP charges these end users a transportation fee only. NSP does not charge the end user for the commodity cost (i.e., the cost of the natural gas), since this has already been paid by the end user to the marketer or producer. In effect, NSP acts as agent for the end user in taking possession of the natural gas at its TBS (which is *outside* the limits of the city), and then transporting the gas (through its pipelines in the city) to the end user. NSP pays a franchise fee to the city for the transportation charges paid by the end users, but does not pay a franchise fee on the cost of the commodity since NSP itself does not collect anything for commodity cost.

The city contends that this type of arrangement causes it to lose revenue because no franchise fee is collected on the commodity cost of the gas which is transported into the city. If the end users in the city had purchased the gas directly from NSP, there is no question that the franchise fee would be due on the commodity cost. But under the arrangements with

EGM and Centran, NSP claims that it has no obligation to collect or pay the franchise fee for the commodity cost, since it collects only for transportation charges, and the gas is clearly "owned" by the end user *before* it is transported into the city.

Neither EGM nor Centran has a franchise agreement of any kind with the city. Nor do these natural gas marketers own or operate any pipes, mains, or other physical facilities within the city.

NSP emphasizes that it does not receive any gross earnings from amounts paid by end users to gas suppliers for the commodity charge and transportation to the TBS. NSP merely contracts with the end user for transportation services, which services it characterizes as "a genuine response to competitive forces" that *increases* the amount of franchise fees collected by the city. (NSP and the marketers claim they have "no choice" but to enter into these kinds of agreements in order to be competitive, because the end users are "fuel switchable" and would turn to other fuels, such as oil, if natural gas prices increased. There is no documentary evidence in the record establishing that end users would in fact switch to other fuels if they had to pay the additional franchise fee sought by the city. The trial court did not make any finding of fact on this question.)

In granting summary judgment for respondents, the trial court stated that the "ultimate issue" is whether EGM and Centran operate a utility within the city, and are therefore required to obtain a franchise. Holding that they do not operate a utility, the court concluded that no franchise agreement was necessary, and granted summary judgment. The court did not reach the federal law issues of preemption and burden on interstate commerce raised by respondents.

## ISSUES

1. Did the trial court err in granting summary judgment to NSP on the breach of contract and constructive fraud claims?

2. Are EGM and Centran required to obtain a franchise from the City of St. Paul

before selling natural gas at retail to customers within the city?

3. Is the city's franchise requirement, as applied to EGM and Centran, preempted by state or federal law?

4. Does the city's franchise requirement, as applied to EGM and Centran, constitute an impermissible burden on interstate commerce in violation of U.S. Const., art. I, § 8?

## ANALYSIS

### Standard of Review

■ On appeal from summary judgment, it is the function of this court only to determine (1) whether there are any genuine issues of material fact and (2) whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium,* 281 N.W.2d 328, 330 (Minn.1979). In this case, there is no issue as to any material fact, and we are limited to determining whether the trial court erred in applying the law.

This court on appeal must view the evidence in the light most favorable to the party against whom the summary judgment motion was granted. *Grondahl v. Bulluck,* 318 N.W.2d 240, 242 (Minn.1982).

## I.

The first issue we must address is whether NSP violated the terms of its franchise agreement with the city. The city seems to have conceded this issue in their brief, although the original complaint included allegations of breach of contract and constructive fraud against NSP.

Minnesota courts have applied contract analysis in determining the obligations of the parties to ordinances granting franchises. *See, e.g., City of South St. Paul v. Northern States Power Co.,* 189 Minn. 26, 29, 248 N.W. 288, 290 (1933) (citing *City of St. Cloud v. Water, Light & Power Co.,* 88 Minn. 329, 331, 92 N.W. 1112, 1113 (1903)); *see also City of Red Wing v. Wisconsin–Minnesota Light & Power Co.,* 139 Minn. 240, 242, 166 N.W. 175, 175 (1918) (rights of litigants based solely upon contract evidenced by franchise ordinance).

In general, franchises are to be construed strictly against the grantee. *City of Duluth v. Duluth Street Railway Co.,* 172 Minn. 187, 192, 172 Minn. 187, 215 N.W. 69, 70–71 (1927). Strict construction should not be resorted to, however, merely to create ambiguity and conflict and thereby justify further construction. *Id.*

■ The granting of franchise benefits and privileges is intended to be secured not only to the municipality itself, but to its inhabitants as well. *City of Red Wing,* 139 Minn. at 242–243, 166 N.W. at 176. Where the interests of the public are involved, doubts and ambiguities must be resolved in favor of that construction which is most advantageous to the public. *Id.,* 139 Minn. at 244, 166 N.W. at 176.

■ Section 2 of the franchise ordinance allows NSP to use the streets and other public property of the city "for the purpose of erecting, installing, and operating gas mains, and for all other necessary appurtenances used in conducting, distributing, and supplying gas for public and private use *and for the purpose of conducting said gas to and through the City.*" (Emphasis added.) There is no requirement that the gas so conducted be owned by NSP.

Section 5 of the franchise ordinance requires the payment of a franchise fee based on "gross earnings," defined as "all sums * * * received by the Company from the sale of gas distributed and used within the corporate limits of the City * * *." It is undisputed that NSP has paid the appropriate franchise fees on the transportation charges for gas shipped to customers of EGM and Centran.

The city alleges that NSP is obligated to collect the franchise fee on the commodity price of the gas it transported for customers of EGM and Centran. No such obligation appears in the contract, however. EGM and Centran are in competition with NSP for sales of natural gas to end users in St. Paul. NSP does not receive any gross earnings from amounts paid by end users for the commodity charge and transportation to its town border station. NSP's

only gross earnings, as defined by the franchise agreement, are for transportation of the gas from the TBS to the end user in St. Paul. NSP has paid the franchise fee on these earnings.

The franchise agreement expressly permits NSP to conduct gas to and through the city. By paying the franchise fee for its gross earnings from the transportation of gas sold by EGM and Centran, NSP has met its obligation under the franchise. Summary judgment was properly granted in favor of NSP on the breach of contract and constructive fraud claims.

## II.

■ In granting summary judgment in their favor, the trial court held that EGM and Centran did not operate a public utility within the city and were therefore not required to obtain a franchise from the city. The city claims that whether EGM and Centran "operate a public utility" is irrelevant and that, "EGM and Centran, in making sales to customers in St. Paul, whether or not described as a public utility, gas marketer, or natural gas retailer, are required to have a franchise from St. Paul."

St. Paul's authority to demand that a franchise be obtained for the distribution of natural gas within the city is derived from Minn.Stat. § 300.03 (1984), which provides that:

A corporation may be organized to * * * furnish power for public use, and any work for supplying the public, by whatever means, with water, light, heat, or power, including all requisite subways, pipes, and other conduits * * *. No corporation formed for these purposes may construct, maintain, or operate a * * * pipe line, or other conduit * * * in or upon a street, alley, or other public ground of a city, without first obtaining from the city a franchise conferring this right and and compensating the city for it.

It is undisputed that EGM and Centran have not engaged, and do not intend to engage, in the construction, maintenance, or operation of a pipeline or other conduit within the city.

The city argues, however, that the holdings of the Minnesota Supreme Court in *Village of Blaine v. Independent School District No. 12*, 265 Minn. 9, 121 N.W.2d 183 (1963) (*Blaine I*), and *Village of Blaine v. Independent School District No. 12*, 272 Minn. 343, 138 N.W.2d 32 (1965) (*Blaine II*), mandate reversal of the trial court's decision.

In *Blaine I*, the Village of Blaine sought to enjoin the school district from constructing a pipeline from outside the village to supply school buildings within the village. Blaine had granted a nonexclusive franchise to a corporation (North Central Public Service Company) to establish and maintain a gas distribution system within the village.

The Village of Circle Pines, on the other hand, was operating its own municipal system for distribution of gas, pursuant to Minn.Stat. § 412.321. Circle Pines had constructed a gas pipeline running parallel to North Central's pipeline, but within the village limits of Circle Pines.

The dispute arose over a contract granted by the school board to the Circle Pine Utilities Commission (CPUC) to supply gas to a school located within the Village of Blaine. In order to fulfill this contract, the school district asked the Village of Blaine to allow CPUC to extend its gas distribution across the boundaries of the village to the school building. The Village of Blaine refused to grant this request.

The school district and CPUC then concocted a scheme whereby the school district would obtain a plot of land within the limits of Circle Pines, but directly opposite its property in Blaine on which the school building stood. A gas line would then be constructed from the district's property in Circle Pines to its property in Blaine, and the line would be connected in Circle Pines to CPUC's pipeline, thereby allowing CPUC to provide gas to the school in Blaine without obtaining a franchise.

The Village of Blaine appealed from an order denying a temporary injunction requiring the school district and CPUC to refrain from contracting for construction

of the proposed line. The supreme court held that an unfranchised utility was *not* permitted to operate within the limits of a municipality which has not given its consent. *Blaine I*, 265 Minn. at 16, 121 N.W.2d 189. The court noted that:

> It would seem that a franchise is necessary in order to "operate" in a municipality. To "operate," the utility must not only lay pipes and install equipment, but also must provide service, collect charges, and do other things necessary to conduct a utility business. *Thus a franchise must be obtained not only to lay pipes to conduct gas across or over the boundaries of the village, or over its streets, alleys, and public grounds, if necessary, but also to do all other things required to establish and to operate a utility.* The grant of a right to maintain and operate public utilities within a municipality and to exact compensation therefor is a franchise.

*Id.*, 265 Minn. at 17, 121 N.W.2d at 189–90 (emphasis added).

NSP, EGM and Centran cite the above passage as authority for the proposition that to "operate" in a city, the utility *must* "lay pipes and install equipment" (which EGM and Centran have not done), *as well as* "provide services, collect charges, and do other things necessary to conduct a utility business," which EGM and Centran *have* done. In the context of the case, however, it is clear that the *Blaine I* court meant that it is *not* necessary to lay pipes and install equipment within a municipality to "operate a utility" within that municipality. Providing service, collecting charges, and doing other things necessary to conduct a utility business constitute operation of a utility for purposes of requiring a franchise.

The *Blaine I* court held that:

> If a municipality refuses to consent to an application from a private or municipal utility to *provide service* within its boundaries, it has statutory authority to prevent such utility *from providing such service* therein competitive to franchised utilities operating therein.

*Id.*, 265 Minn. at 18, 121 N.W.2d at 190 (emphasis added).

In *Blaine II*, the supreme court upheld the district court's grant of a permanent injunction against the school district and Circle Pines, concluding that:

> [I]t is unimportant that the pipe through which the gas flows is owned by a school district and not Circle Pines, and that the sale and furnishing of the commodity takes place in Circle Pines * * * since these facts do not change the fact that it is the Circle Pines Utilities Commission which is furnishing gas to consumers in Blaine without the consent of that village and, therefor, contrary to the statute. Plaintiffs are entitled to have the courts look at the effect of defendants' plan, which is simply that the Circle Pines Utilities Commission is furnishing natural gas via pipe system to consumers in the Village of Blaine without obtaining a franchise and without the latter's consent. If the legislature deems it wise that only utility companies who are so authorized by a franchise may serve consumers within a particular municipality, then the statutes so providing ought to be given the intended effect. Defendants' arrangement to circumvent them cannot stand.

*Id.*, 272 Minn. at 361, 138 N.W.2d at 44–45.

The *Blaine* cases establish that a utility company cannot sell natural gas to citizens of a municipality without obtaining a franchise from the municipality. EGM and Centran emphasize that they have no facilities in St. Paul, and that the sale is consummated outside the city limits. But the fact remains that the companies are furnishing natural gas to St. Paul's citizens without the consent of the city, and the effect of these arrangements is to circumvent St. Paul's franchise requirement, and to avoid paying the franchise fee on the commodity charge.

Respondents claim they must enter into this type of arrangement in order to remain "competitive." At this point, there is no factual support in the record for this assertion. In any event, the city is not required to forfeit its statutory right to demand that

EGM and Centran obtain franchises in order to bolster their ability to compete in the natural gas market.

EGM and Centran are furnishing natural gas to citizens of St. Paul without a franchise, which the *Blaine* cases prohibit them from doing. We therefore reverse the trial court's grant of summary judgment in favor of EGM and Centran.

### III.

■ The trial court did not reach the issue of whether St. Paul's franchise requirement is preempted by state or federal law. This issue was raised below, but because the trial court determined that the state law issues were dispositive, it did not deal with the federal questions.

In general, the trial court's record is conclusive on appeal, and this court is limited to reviewing questions presented to and decided by the lower court, and to the trial court's record. *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 68 n. 2 (Minn.1979) (citing *Loth v. Loth*, 227 Minn. 387, 399, 35 N.W.2d 542, 550 (1949)). However, this general rule is subject to the well-established exception that an appellate court may base its decision upon a theory not presented to or considered by the trial court where the question raised for the first time on appeal is plainly decisive of the entire controversy on its merits, and where there is no possible advantage or disadvantage to either party in not having had a prior ruling by the trial court on the question. *Holen v. Minneapolis–St. Paul Metropolitan Airports Commission*, 250 Minn. 130, 135, 84 N.W.2d 282, 286 (1957).

Respondents NSP, EGM and Centran claim that enforcement of the St. Paul franchise requirement is preempted by state and federal law. As the city notes in its brief, however, none of the respondents has cited to any provision of federal or state law which prohibits or otherwise limits a municipality from collecting franchise fees on natural gas sold at retail within its borders.

The circumstances in which federal law pre-empts state regulation are well-settled. Congress may explicitly define the extent to which its enactments pre-empt state or local laws. Or, in the absence of explicit statutory language, Congress implicitly may indicate an intent to occupy a given field to the exclusion of state law. Finally, even where Congress has not entirely displaced state regulation in a particular field, state law is pre-empted when it actually conflicts with federal law. Such a conflict will be found when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 108 S.Ct. 1145, 1150–1151, 99 L.Ed.2d 316 (1988) (citations omitted).

The United States Supreme Court has held that the acts of Congress relative to "all wholesales of natural gas in interstate commerce" represent a comprehensive legislative scheme which excludes state law. *Schneidewind*, 485 U.S. at 300, 108 S.Ct. at 1151. This comprehensive regulatory scheme applies only to *wholesale* transactions however, and Congress has left the regulation of direct retail sales to the states. *Panhandle Eastern Pipeline Co. v. Public Service Commission*, 332 U.S. 507, 519, 68 S.Ct. 190, 196, 92 L.Ed. 128 (1947). *See Northern Natural Gas Co. v. Minnesota Public Service Commission*, 292 N.W.2d 759, 761 (Minn.1980).

It is undisputed that the sales in question here were *retail* sales by EGM and Centran to customers in St. Paul. Such sales may properly be the subject of state and local regulation.

The intent of FERC Order 436 is to create greater competition in natural gas sales. There is no apparent conflict with this purpose in a non-discriminatory franchise requirement which is applied consistently to all natural gas suppliers who wish to do business in St. Paul. Respondent EGM states that:

[T]he new federal regulatory scheme and the state programs adopted in connection therewith have as their primary objective the unfettered access for gas purchasers to gas suppliers nationwide at market-responsive prices. This scheme seeks to

achieve this objective by removing previously existing obstacles to that access, including transportation practices and restrictive provisions in gas sales contracts.

St. Paul's franchise requirement is neither a "transportation practice" nor a "restrictive provision in a gas sales contract." It does not limit the "unfettered access" of gas purchasers within the city to gas suppliers nationwide. It merely requires that *all* such suppliers comply with its franchise requirements, and pay the applicable franchise fees on gross profits for sales within the city.

## IV.

■ Respondents also raise the issue of whether St. Paul's franchise requirement violates the Commerce Clause. The U.S. Supreme Court has held that the sale and distribution of gas to local consumers made by one engaged in interstate commerce is essentially local and therefore subject to state regulation without infringing on the commerce clause. *Panhandle Eastern Pipeline Co. v. Michigan Public Service Commission*, 341 U.S. 329, 333, 71 S.Ct. 777, 779, 95 L.Ed. 993 (1951).

In this case, EGM and Centran made retail sales to end users in St. Paul, with delivery to town border stations outside the city. St. Paul's franchise requirement applies to *all* retail sales of natural gas in the city, and does not discriminate between local companies and out-of-state marketers. If the St. Paul franchise requirement is not an impermissible burden on interstate commerce as applied to NSP, it is not clear why it becomes an impermissible burden as applied to other companies that sell natural gas at retail in St. Paul.

In the *Panhandle/Michigan* case, 341 U.S. at 334, 71 S.Ct. at 780, the Supreme Court noted that:

Appellant asserts a right to compete for the cream of the volume business without regard to the local public convenience or necessity. Were appellant successful in this venture, it would no doubt be reflected adversely in Consolidated's over-all costs of service and its rates to customers whose only source of supply is Consolidated. This clearly presents a situation of "essentially local" concern and of vital interest to the State of Michigan.

In this case, it is respondents EGM and Centran who seek to compete with the franchised utility (NSP) for the "cream of the volume business." To the extent that they are able to avoid the franchise fee requirement, they can undercut NSP on this volume business, and thereby cause NSP (and the city) to lose income. NSP may then be required to recover this lost income by raising the rates it charges to smaller-volume consumers (including residential customers). This clearly presents a situation of essentially local concern to St. Paul, and justifies the city's effort to apply its franchise requirement to *all* companies that supply natural gas to the citizens of St. Paul, including respondents EGM and Centran.

## DECISION

We affirm the trial court's grant of summary judgment in favor of NSP on the breach of contract and constructive fraud claims. We reverse the summary judgment in favor of EGM and Centran, however, and remand to the trial court with instructions to grant declaratory and injunctive relief, and such other relief as the trial court may find appropriate, as requested by the City of St. Paul. NSP represented to this court at oral argument that if non-franchised sales to St. Paul customers by EGM and Centran were enjoined, NSP would not allow its pipeline to be used in violation of such injunction. The trial court is directed to determine the necessity for a separate injunction against NSP, and to issue such injunction or other order as it may, in its discretion, find necessary.

Affirmed in part, reversed in part and remanded.