CITY OF SAINT PAUL, Respondent,

v.

NORTHERN STATES POWER COMPANY, Centran Corporation, and Enron Gas Marketing, Inc., Petitioners, Appellants.

No. C5–89–1687.

Supreme Court of Minnesota.

Nov. 2, 1990.

Northern States Power Co., Minneapolis, for NSP.

John Paul Martin, Kevin J. Dunlevy, Peterson, Tews & Squires, Mpls., for Centran Corp.

Elmer B. Trousdale, Michele L. Courneya, Oppenheimer, Wolff & Donnelly, St. Paul, for Enron Gas Mrktg., Inc.

Jane A. McPeak, City Atty., Philip B. Byrne, Asst. City Atty., St. Paul, and of counsel: Sara A. Poulos, Robins, Kaplan, Miller & Ciresi, Minneapolis, for respondent.

David J. Muchow, Miriam S. Pederson, American Gas Assoc., Arlington, Va., for amicus American Gas Assoc.

Ralph J. Pearson, Jr., Texaco, Inc., Houston, Tex., and John H. Sharp, Washington, D.C., for amicus Natural Gas Supply Assoc.

Clement F. Springer, Jr., William D. Carstedt, Defrees & Fiske, Chicago, Ill., for amicus Interstate Power Co.

Samuel L. Hanson, Michael C. Krikava, Briggs & Morgan, and Gene R. Sommers,

YETKA, Justice.

This case arises from an action brought by the City of St. Paul seeking a declaratory judgment that the appellants Centran Corporation and Enron Gas Marketing, Inc. (EGM) obtain a franchise to sell natural gas to end users within the city. St. Paul also sought to enjoin appellant Northern States Power (NSP) from transporting natural gas owned by others to end users through its gas lines within the city. On cross motions for summary judgment (St. Paul sought partial summary judgment), the district court ordered judgment for the appellants. The court of appeals affirmed the trial court's judgment in favor of NSP, but reversed as to Centran and EGM, holding, in effect, that Centran and EGM were furnishing natural gas to citizens of St. Paul without a franchise. 450 N.W.2d 599. The court of appeals also held that the franchise requirement was neither

pre-empted by federal law [1] nor violative of the commerce clause,[2] issues not reached by the trial court. We reverse and reinstate the decision of the trial court.

The facts in this case are not in dispute. Appellants Centran and EGM are gas marketing companies which purchase gas from suppliers and make sales directly to industrial and commercial consumers called "end users." Appellant NSP, a local distribution company (LDC), has been granted a franchise to supply natural gas within the City of St. Paul. St. Paul is served by a single natural gas pipeline which is owned and operated by Northern Natural Gas Company. Northern has been certified an "open access" transporter whereby it must transport gas on a nondiscriminatory basis for any shipper paying appropriate transportation fees.

The transactions at issue here involve the purchase of gas by end users from Centran and EGM. Northern transports this gas to an NSP town border station (TBS) where title passes to the end user. These TBS's are located outside the city limits of St. Paul and are owned in part by NSP and Northern. Neither Centran nor EGM owns any facilities, pipes, or conduits in St. Paul.

Once at the TBS, the gas is then transported, for a fee, by NSP through its franchised system to the end users. The end users pay Centran and EGM directly for the cost of the gas. Pursuant to a Minnesota Public Utilities Commission (MPUC) tariff, the end users also pay NSP a transportation fee. NSP must provide transportation for any entity meeting the terms of the tariff. Pursuant to its franchise, NSP pays gross earnings fees on all gas it sells to end users and on all transportation fees paid by the end users. Thus, it does not pay the gross earnings fee on the commodity cost of the gas it transports for Centran and EGM.

The role of NSP in these transactions is not clear. In some transactions, NSP functions as an agent for the purchaser and/or supplier. According to St. Paul, in this agency arrangement, NSP has been "negotiating and coming to terms with Centran and EGM on behalf of the end user, and arranging for all transportation services." St. Paul also states that "EGM sells its gas (or gas which it has the power and right to sell) to 'NSP as agent' for customers within St. Paul." Appellant Centran states, however, that it has not sold gas to "NSP as agent" for customers within St. Paul.

Centran and EGM have entered into a total of 18 contracts with end users within St. Paul between October 1986 and March 1987. These contracts involved eight different end users: Centran contracted with one end user while EGM contracted with seven. All eight end users were customers of NSP prior to the contracts with Centran and EGM. Prior to these transactions, NSP made the sales of natural gas to all end users in St. Paul. Thus, St. Paul claims that it is losing revenues by the new procedures used.

Since issues in this case turn on the nature of natural gas regulation, a brief historical discussion is in order. In 1938, Congress enacted the Natural Gas Act (NGA), 15 U.S.C. §§ 717–717z (1988). The act granted the Federal Power Commission (now the Federal Energy Regulatory Commission or FERC) jurisdiction to regulate three areas: sales for resale in interstate commerce; transportation in interstate commerce; and facilities used for such purposes. 15 U.S.C. at § 717; *see also* Pierce, *Reconstructing the Natural Gas Industry from Wellhead to Burnertip,* 9 Energy L.J. 1, 2–12 (1988) (tracing the history of natural gas regulation). Though section 1(b) of the NGA has traditionally pre-empted "wholesale" regulation, it "expressly carves out a regulatory role for the States, however, providing that the States retain jurisdiction over intrastate transportation, local distribution and distribution facilities, and over 'the production or gathering of natural gas.'" *Northwest Central Pipeline Corp. v. State Corp. Comm'n of Kansas,* 489 U.S. 493, 109 S.Ct. 1262, 1272, 103

---

**1.** The Supremacy Clause, U.S. Const. art. 6, cl. 2 mandates that federal law overrides lower authority when there is a conflict between the two.

**2.** U.S. Const. art. I, § 8, cl. 3.

L.Ed.2d 509 (1989). Thus, the states retained the right to regulate direct retail sales to consumers. *Panhandle Eastern Pipe Line Co. v. Michigan Pub. Serv. Comm'n,* 341 U.S. 329, 334, 71 S.Ct. 777, 780, 95 L.Ed. 993 (1951); *Panhandle Eastern Pipe Line Co. v. Public Serv. Comm'n of Indiana,* 332 U.S. 507, 516–18, 68 S.Ct. 190, 194–96, 92 L.Ed. 128 (1947); *see also* Colton & Sheehan, *Regulatory Control of Natural Gas Procurement Practices in Illinois: Permissible Regulation or Preempted Activity?* 35 De Paul L.Rev. 317, 325 (1985) ("This [NGA 1(b) ] language excludes from federal regulation direct sales by pipelines to industrial users because direct sales are not sales for 'resale.' Also, [FERC] jurisdiction does not extend to the local distribution of gas.").

Because of severe gas shortages in the 1970's, in 1978, Congress enacted the Natural Gas Policy Act (NGPA), 15 U.S.C. §§ 3301–3432 (1988). The NGPA restructured the regulation of natural gas by merging the interstate and intrastate markets. It also provided for phased deregulation of most new (post-enactment) gas and for the continued regulation of old (pre-enactment) gas.

The structure of the natural gas industry changed once again in 1985 when the FERC issued Order 436.[3] Order 436 provides that pipelines and suppliers who apply to become "open access" transporters must offer transportation services on a non-discriminatory basis to any shipper requesting the service and paying the fee. Thus, pipeline companies have "unbundled" their services, providing separate charges for gas, transportation, storage and other services:

> The essence of Order 436 is a tendency, in the industry metaphor, to "unbundle" the pipelines' transportation and merchant roles. If it is effective, the pipelines will transport the gas with which their own sales compete; competition from other gas sellers (producers or trad-

ers) will give consumers the benefit of a competitive wellhead market.
> *Associated Gas Distrib. v. F.E.R.C.,* 824 F.2d 981, 994 (D.C.Cir.1987) (wherein the court upheld the provisions of Order 436 at issue here). Thus, the LDC or end user may now select the services which best fit its needs. *Michigan Consol. Gas Co. v. Panhandle Eastern Pipeline Co.,* 887 F.2d 1295, 1297 (6th Cir.1989).

There were many issues raised in this litigation, including the following:

1. Are gas marketers that own no facilities inside St. Paul, but which are selling gas within the city, subject to a franchise requirement?
2. Are the gas marketers operating as utilities within St. Paul?
3. Do *Village of Blaine v. Independent School District No. 12,* 265 Minn. 9, 121 N.W.2d 183 (1963) (*Blaine I*), and *Village of Blaine v. Independent School District No. 12,* 272 Minn. 343, 138 N.W.2d 32 (1965) (*Blaine II*), apply to entities owning no facilities within St. Paul?
4. Is the St. Paul franchise requirement imposed upon the gas marketers preempted by federal regulation?
5. Does the St. Paul franchise fee requirement as applied to Centran and EGM violate the commerce clause?
6. Is St. Paul's franchise requirement a *per se* violation of the commerce clause?
7. Is the burden imposed on interstate commerce by the St. Paul franchise requirement excessive in relation to the putative local benefits?

We do not find it necessary to discuss the federal law issues raised in this case because we believe that the case can be decided on state law alone.

On appeal from a summary judgment, if there are no issues of material fact, review is limited to a determination of whether the trial court correctly applied the law to the facts. *Betlach v. Wayzata Condominium,* 281 N.W.2d 328, 330 (Minn.1979).

---

**3.** Order 436, *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol,* [1982–1985 Regs.Preambles] F.E.R.C. Stats. & Regs. ¶ 30,665 at 31,463, 31,467, 50 Fed.Reg 42,408 (1985).

Since in this matter all parties stipulated to the facts, the only issue before this court is application of the law to the undisputed facts. *Id.*

■ To be a franchise, "the right possessed must be such as cannot be exercised without the express permission of the sovereign power,—a privilege or immunity of a public nature which cannot be legally exercised without legislative grant." *General Minn. Util. Co. v. Carlton County Coop. Power Ass'n*, 221 Minn. 510, 519, 22 N.W.2d 673, 677 (1946). A city's franchise power is derived from Minn.Stat. § 300.03 (1988), which provides in part:

> A corporation may be organized to * * * furnish power for public use, and any work for supplying the public, by whatever means, with water, light, heat, or power, including all requisite subways, pipes, or other conduits * * *. No corporation formed for these purposes may construct, maintain, or operate a * * * pipe line or other conduit * * * in or upon a street, alley, or other public ground of a city, without first obtaining from the city a franchise confirming this right and compensating the city for it.

Pursuant to section 300.03, the City of St. Paul enacted St. Paul Charter § 16.01, which states in pertinent part:

> Except as otherwise provided by law, no person, firm or corporation shall place or maintain any permanent or semipermanent fixtures in, over, upon or under any street or public place for the purpose of operating a public utility without a franchise therefor from the City.

■ Citing the above statutory language, appellants [4] make two arguments: (1) under Minn.Stat. § 300.03, a franchise is only required "to construct, maintain or operate" a pipeline or conduit; (2) under section 16.01, the City Charter only prohibits a non-franchised public utility from placing, maintaining and operating utility fixtures in, over, on, or under the streets. Appellants contend that, since Centran and EGM have no utility fixtures within the city and that the statute or the City Char-

ter does not require a franchise for merely marketing gas, they are not engaging in franchisal activity subject to St. Paul regulation. EGM argues that it does not operate a utility within the city for local distribution and is not a party to a local distribution contract. Since its only connection to St. Paul is its customer there, EGM argues that it is not subject to the franchise requirement. We agree.

Respondent St. Paul argues that *Village of Blaine v. Independent School District No. 12*, 265 Minn. 9, 121 N.W.2d 183 (1963) (*Blaine I*), and *Village of Blaine v. Independent School District No. 12*, 272 Minn. 343, 138 N.W.2d 32 (1965) (*Blaine II*), control in this case. In those cases, the Village of Blaine granted a non-exclusive franchise to North Central Public Services. Independent School District No. 12 (ISD No. 12) operated a school in the Village of Blaine which was located across a county road from the Village of Circle Pines. ISD No. 12 decided to purchase gas from the Circle Pines Utility Commission (CPUC), a neighboring municipal gas utility. The CPUC did not have a franchise to operate in Blaine.

ISD No. 12 and CPUC made an arrangement whereby land in Circle Pines was given to ISD No. 12. Upon this land, a metering station was built to which CPUC gas could be delivered. The arrangement also included construction of a private gas main under the village border by ISD No. 12 to the CPUC transmission station. The Village of Blaine sought to enjoin ISD No. 12 from taking gas from CPUC. The trial court denied the injunction. This court in *Blaine I* remanded for a trial on the merits. On remand, the trial court issued a permanent injunction, which this court upheld in *Blaine II.*

St. Paul argues that there are many factual similarities between the *Blaine* cases and this case. Specifically, the unfranchised seller had no mains, no metering stations, and did not physically extend its gas transmission system into Blaine.

---

**4.** Not all appellants or amici curiae have made the arguments ascribed to them in this opinion, but for ease of reference, the collective term "appellants" is used.

Thus, St. Paul argues, the court did not find those facts dispositive. The court's focus, St. Paul contends, was not on where the transmission took place, but on the fact that an unfranchised entity was supplying gas without the consent or permission of the municipality.

Furthermore, in response to the appellants' argument that physical facilities are needed within the city for the franchise requirement to attach, St. Paul contends that the reasoning or result in *Blaine I* and *II* would not have been different if the CPUC had been using the pipes of North Central (as opposed to the pipes of ISD No. 12) without the consent of the municipality.

St. Paul contends that *Blaine I* and *II* determined that the franchise rights of a municipality under Minn.Stat. § 300.03 were not limited to streets, alleys, and public grounds; rather, the rights include all the territory within the municipality's border. Furthermore, since the language of section 16.01 mirrors the language of section 300.03, the same expansive reading should be given to it. In other words, since section 300.03 applies not only to public streets and grounds, but to the whole territory "within the municipal corporate limits," section 16.01 should apply to the whole territory as well.

Appellants, on the other hand, argue that *Blaine I* and *II* are distinguishable. The franchise in the Blaine cases received no revenue from the transportation of the gas akin to the tariffs granted by the MPUC. Furthermore, the pipeline was in direct competition with the franchised entity. Appellants also contend that, in *Blaine I* and *II*, the court did not find objectionable the fact that ISD No. 12 was intending to purchase the gas from CPUC, but that the pipeline circumvented the franchised utility. Here, neither Centran or EGM has tried to bypass NSP or St. Paul. Appellants contend that they are not "concocting a scheme," as the court found in *Blaine I* and *II*, but are following a federally mandated system. Finally, appellants note that, in *Blaine I*, this court set out the following requirements for a franchise:

To "operate," the utility must not only lay pipes and install equipment, but also must provide service, collect charges, and do other things necessary to conduct a utility business. Thus a franchise must be obtained not only to lay pipes to conduct gas across or over the boundaries of the village, or over its streets, alleys, and public grounds if necessary, but also to do all other things required to establish and operate a utility.

265 Minn. at 17, 121 N.W.2d at 189–90. Thus, the *Blaine I* court held that, to "operate" a utility, the company must both lay pipes and do those other things necessary to conduct a utility business. Appellants contend that Centran and EGM engage in none of these activities.

We find appellants' argument persuasive. Thus, we find the *Blaine* cases distinguishable.

The *Blaine* language on which St. Paul relies—that entities supplying gas to a municipality must first acquire the consent of the municipality—is attributable to this court's analysis of Minn.Stat. § 412.321 (1988) in *Blaine II*, 272 Minn. at 361, 138 N.W.2d at 45. While it is true that, pursuant to section 412.321, a municipality cannot extend its utility system into another municipality without the latter's consent, it is also undisputed that section 412.321 is not at issue in this case. Thus, the consent required pursuant to that statute is not applicable here.

The facts surrounding this court's analysis of Minn.Stat. ch. 300 in the *Blaine* cases are also distinguishable. In the *Blaine* cases, the question of whether the entity supplying the natural gas, the CPUC, was a public utility was not at issue. St. Paul argues that Centran and EGM are utilities operating within the city. To hold that they are would require a very broad definition of "utility," a definition that would stretch the meaning of section 300.03, section 16.01, and the *Blaine* cases beyond their proper reading.

While chapter 300 allows a corporation to be formed in order to supply natural gas and requires it to be franchised to do so, the statute appears to be tailored to cover

those companies which install the means to supply the power. St. Paul Charter § 16.01 also appears to be so tailored. Thus, an entity, to operate as a utility, must "not only lay pipes and install equipment, but also must provide service, collect charges, and do other things necessary to conduct a utility business." *Blaine I*, 265 Minn. at 17, 121 N.W.2d at 189–90. Neither Centran nor EGM has laid pipes or installed the necessary equipment. As stated in *Griffin v. Oklahoma Natural Gas Corp.*, 37 F.2d 545, 548 (10th Cir.1930), a case cited in *Blaine I*, 265 Minn. at 17, 121 N.W.2d at 190:

> [T]he word "franchise" [as defined by state statute] means a special franchise to establish and maintain a public utility, to use the streets therefor and to collect compensation for services, and not an ordinary contract to purchase gas, such as the contracts involved in the instant case, which are expressly authorized by [state law].

*Griffin*, 37 F.2d at 548. Since Centran and EGM are only engaging in the sale of gas, they are not operating as utilities.

Pursuant to Minn.Stat. ch. 300, St. Paul may impose a franchise and set the compensation therefor. The City of St. Paul's ordinance with NSP imposes a franchise fee in the form of gross earnings of NSP. Under the ordinance, "gross earnings" is defined as "all sums * * * received by the Company from the sale of gas distributed and used within the corporate limits of the City." St. Paul, MN, Ordinance No. 17,210, § 5. If the main objective of appellants here is to avoid payment of the franchise fee, that objective is proper if the effort to avoid the fee is not a conspiracy or an illegal combination. St. Paul has admitted in the record that appellants have not attempted to avoid the fee by fraudulent means. Thus, that question is not at issue.

On the other hand, if St. Paul's main objective in attempting to require a franchise of Centran, EGM, and similar entities is to collect a fee on all sales of natural gas within the city, it appears to us that it would have been more appropriate to include that objective in Ordinance No. 17,-210. While it is not our province to tell the city what it should or should not have done, that objective could have been easily achieved. NSP is the sole local distributor for the city and owns and operates the transmission system within the city. The fee could have applied to all sales by NSP or all gas transported by NSP within the city, with the fee based on cost of delivery and sale price to the end user. However, the ordinance, as adopted, only applies the fee to the gross earnings of NSP. If the city intends to impose a non-discriminatory tax on sales of natural gas within the city, it should do so by direct ordinance, or if it lacks existing legal authority to do so, seek such approval from the Minnesota Legislature.

While we do not deem it necessary, therefore, to reach the federal issues raised by the parties in their briefs, it is difficult to envision how the franchise scheme advocated by St. Paul would not pose a very heavy burden on interstate commerce. Though the record does not disclose how many possible sellers of natural gas to end users in St. Paul might exist, either within or without the State of Minnesota, the record does indicate that there are currently eight large end users within St. Paul taking advantage of direct sales from out-of-state suppliers, and these numbers are expected to grow. Thus, the unreasonableness of requiring every seller to acquire a franchise to sell gas within the City of St. Paul becomes apparent. If each seller were required to secure a franchise in St. Paul (or Minneapolis or any other municipality in the State of Minnesota), would a seller of natural gas located in the southwest be encouraged to make a bid to supply such gas without knowing whether it would receive a franchise or not? Would the franchise be adopted in time to complete the sale? It appears that the result in cost and effort would discourage these sellers from making a bid for the sale in the first instance.

Since we find that the *Blaine* cases do not control the transactions here, that sections 300.03 and 16.01 do not grant St. Paul power over Centran and EGM, and that City Ordinance No. 17,210 does not include

the type of sales made by Centran and EGM, the court of appeals is reversed, and the decision of the trial court is reinstated.